787 So.2d 765 (2001)
Lamar Z. BROOKS, Appellant,
v.
STATE of Florida, Appellee.
No. SC94308.
Supreme Court of Florida.
April 5, 2001.
Rehearing Denied June 4, 2001.
*768 Kepler B. Funk and Keith F. Szachacz of Funk & Szachacz, P.A., Melbourne, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Barbara J. Yates, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court adjudicating guilt of first-degree murder and imposing the death penalty upon Lamar Brooks. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Because of the prejudice resulting from the erroneous admission of extensive hearsay testimony, we reverse Brooks' convictions and remand for a new trial.

FACTS
In the late night hours of April 24, 1996, Rachel Carlson and her three-month-old daughter, Alexis Stuart, were found stabbed to death in Carlson's running vehicle in Crestview, Florida. Carlson's paramour, Walker Davis, and Brooks were charged with the murders. Davis was married and had two children, and his wife was pregnant with their third child. However, the victim believed Davis was also the father of her child and demanded support *769 from him.[1] Davis became concerned about this pressure. He was convicted of the murders and sentenced to life imprisonment. However, he did not testify at Brooks' trial.
Brooks lived in Pennsylvania but had traveled to Florida from Atlanta with his cousin Davis and several friends on Sunday, April 21, 1996. Brooks stayed with Davis at Eglin Air Force Base for a few days before returning to Pennsylvania. In interviews with the police, he informed them that on the following Wednesday evening, the night of the murders, he helped Davis set up a waterbed, watched some movies, and walked Davis's dog.
Contrary to Brooks' statements, several witnesses placed him and Davis in Crestview on the night of the murders, although no physical or direct evidence linked him to the crimes. Mark Gilliam testified about a conversation between Davis, Brooks and himself wherein all three men allegedly joked about various ways they would kill Carlson because of pressure she exerted on Davis to support her child. Gilliam testified that he did not take the conversations seriously and thought it was all a joke. In exchange for his testimony, the State promised Gilliam he would not be prosecuted in any manner for his involvement in the murders of Carlson and Stuart. The State also presented the testimony of Terrance Goodman, a jailhouse informant and six-time convicted felon incarcerated with Brooks, who testified about comments Brooks made concerning the murders. In return for Goodman's testimony against Brooks, the State agreed to reduce a first-degree murder charge against him to a third-degree murder without a firearm charge and agreed to recommend a downward departure from the sentencing guidelines.
In addition to Gilliam and Goodman, the State was permitted to introduce, over objection, numerous hearsay statements made by Davis that were used against Brooks. Brooks was convicted of first-degree murder and sentenced to death. As noted, Davis had been previously convicted and sentenced to life, and his convictions and sentence were affirmed on appeal. See Davis v. State, 728 So.2d 341 (Fla. 1st DCA 1999).
Brooks raises fifteen issues in this appeal.[2] In light of our remand for a new trial, we find all the issues raised by Brooks moot, except those relating to the hearsay statements and issues (8) and (9) as they may affect the subsequent retrial of the case.

HEARSAY
Brooks asserts that his constitutional right to confront his accusers and the evidence against him by cross-examination *770 and otherwise was violated throughout the trial by the admission of numerous hearsay statements made by persons who did not testify at trial. Most of the statements complained of were focused solely on Davis and his motives and plans to kill the victims. Indeed, Brooks claims that his trial was really a retrial of Davis, rather than a trial limited to evidence about Brooks.
Initially, Brooks alleges that the trial court erred in admitting statements made by Carlson to her friends on the night of the murders as to her relationship with Davis and her intended activities, as well as numerous statements made by Davis evidencing his intent to kill Carlson and her baby, his purchase of a life insurance policy for the baby, which named him as the primary beneficiary, and his intent to purchase an expensive vehicle in cash.

Carlson's Statements About Davis
Brooks argues that the trial court erred in admitting statements by Carlson to her coworkers, along with an e-mail sent by Carlson to Davis, evidencing her intent to drive to Crestview with Davis on the night of the murders. Several of Carlson's coworkers and friends testified that Carlson had told them that she and Davis were going to visit Davis's aunt in Crestview on the evening of April 24. Several of these people also testified she had told them that she needed some money from him and that she wanted him to sign some paternity papers. Michael Lynes, a computer employee at Eglin Air Force Air Base, testified that he retrieved an e-mail message sent by Carlson to Davis. The message was dated April 24 and read as follows: "We can go there again tonight, but I need gas money. Also, let's try to go a little earlier. I'm about to fall over I'm so tired from the last two nights. Also, if you can, I need some money for diapers. She's almost out and I'm flat broke. Call me." This message was deleted from Davis's computer at work at 7:03 a.m. on April 25, the morning after the murders.
The trial court allowed this testimony as an exception to the hearsay rule under section 90.803(3), Florida Statutes (1997), which provides an exception for evidence of the state of mind of the maker of the statements when such state of mind is relevant to an issue at trial. Brooks claims this was error because a statement admitted to show state of mind is only allowed to prove the state of mind or subsequent act of the declarant, not of a defendant. Here, Brooks alleges that the trial court erred in allowing the State to introduce these statements directly against Brooks to show that Davis traveled to Crestview with Carlson on the night of the murders. We agree.
Hearsay is defined as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." § 90.801(1)(c), Fla. Stat. (1997). Section 90.803 provides an exception to the hearsay rule and that the following are not inadmissible as evidence, even though the declarant is available as a witness:
(3) Then-Existing Mental, Emotional, or Physical Condition.
(a) A statement of the declarant's then-existing state of mind, emotion, or physical sensation, including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health, when such evidence is offered to:
1. Prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when such state is an issue in the action.
2. Prove or explain acts of subsequent conduct of the declarant.
§ 90.803(3), Fla. Stat. (1997). Under this exception, however, a declarant's statement *771 of intent under section 90.803(3) is only admissible to infer the future act of the declarant, not the future act of another person. See Bailey v. State, 419 So.2d 721 (Fla. 1st DCA 1982) (stating that statements by a victim are not admissible to prove subsequent acts of a defendant). Further, ordinarily, a victim's state of mind is not a material issue, nor is it probative of a material issue in a murder case. See Woods v. State, 733 So.2d 980, 987 (Fla.1999). However, there are some exceptions to this general rule.
First, a victim's state of mind may be relevant to an element of the crime. See Stoll v. State, 762 So.2d 870 (Fla.2000). Second, "the victim's state of mind may become relevant to an issue in the case where the defendant claims: (1) self-defense; (2) that the victim committed suicide; or (3) that the death was accidental." Id. at 874-75 (citing Woods, 733 So.2d at 987-88); see also Charles W. Ehrhardt, Florida Evidence § 803.3a (2000 ed.). Finally, the state of mind of the victim-declarant may become an issue in a case when it is used "to rebut a defense raised by the defendant." 762 So.2d at 875 (citing State v. Bradford, 658 So.2d 572, 574-75 (Fla. 5th DCA 1995)).
However, in the instant case, as in Stoll, the victim's state of mind was not relevant to an element of the crime. Moreover, Brooks did not claim either self-defense, that Carlson committed suicide, or that the death was accidental. Further, the record does not demonstrate that Carlson's state of mind became relevant to rebut a defense raised by the defendant Brooks. At trial, Brooks asserted no alibi defense and did not dispute that he was in Crestview on the night of the murders.
Moreover, we find that Bradford is inapplicable here. In Bradford, the defendant was charged with the first-degree murder of his ex-girlfriend. Part of the evidence against the defendant was the presence of his fingerprints in the victim's new car. In response to this evidence, the defendant claimed that his fingerprints were in her car because even after their break-up, the victim would visit him and would allow him into her car. To rebut this explicit claim, the State sought to introduce statements under § 90.803(3)(a)(1) made by the victim to her daughter expressing fear of her ex-boyfriend. These statements included the victim's changing of apartments and vehicle so that the defendant would not be able to find her. The trial court disallowed these statements. On appeal, the Fifth District disagreed and held:
The victim's statements of fear are not admissible as proof that it was the defendant who killed her, but her statements of fear are admissible to rebut the defendant's theory that the victim willingly let him inside her car and that is how his fingerprints got in her car. If the defendant does not put forth the theory that the victim willingly let him in the car, then her state of mind would not be an issue.
658 So.2d at 575. As in Bradford, it is initially important to note that Carlson's statements could not be admitted to prove that Brooks killed her and her baby, especially since the statements reflected Carlson's intent to travel to Crestview with Davis, not Brooks. Importantly, even the Bradford court specifically noted that in this context, the statements could only be used as rebuttal evidence of the claim asserted by the defendant. See id. at 575. In the instant case, the State sought and was permitted to introduce the statements in its case-in-chief, not as rebuttal evidence. Second, and more importantly, because the State used the statements to show Brooks' subsequent acts of driving to Crestview with Carlson, their admission was error. As noted earlier, under section 90.803(3), *772 statements of intent can ordinarily be used to prove the subsequent acts of the declarant, not a defendant. See Bailey. For the foregoing reasons, we find that the State failed to demonstrate any proper predicate for admitting these statements against Brooks, and the trial court erred in allowing these out-of-court statements to be heard by the jury.

Davis's Statements
Brooks' major complaint about hearsay is that the trial court erred in allowing numerous hearsay statements made by Davis out of court and well before any alleged conspiracy was established, evidencing his motive, plan, and intent to kill Carlson and her baby. Specifically, the State introduced the testimony of Steve Mantheny, a life insurance salesman. He testified that on February 20, 1996, almost two months before the murders, Davis applied for a life insurance policy naming his baby, Stuart, as the insured and himself as the primary beneficiary. At trial, Brooks objected not only to Mantheny's testimony but also to the introduction of the actual life insurance policy. Wayne Samms, a friend of Davis, was permitted to testify that about a month before the murders, Davis complained to him that Carlson kept "bugging him" and asking him for money, and "that her and the little dip were done." He understood this to mean that Davis was going to kill them and that he was not going to pay them any more money. The State also introduced the testimony of David Johnson, a car dealer, who testified that in the early part of April, Davis talked to him about purchasing a car worth about $32,000 and that "Davis was coming into some money." Similarly, Anthony Sievers, another friend of Davis, testified that Davis told him he was contemplating getting a new car and that there would be no payments involved.[3] Finally, Rochelle Jones, a friend of Davis, testified as to a conversation she had with Davis on Monday or Tuesday before the murders in which Davis told her that a man owed him money and he was going to get the money, but that he would have to "smoke the dip with the baby" because she would be able to tie him to that man. She understood smoking the dip with the baby to mean that he would have to "kill that girl, the baby."
As noted, the trial court also allowed these statements under the state of mind exception to the hearsay rule of section 90.803(3). On appeal, the State now argues that they were properly admitted as statements of a co-conspirator under section 90.803(18)(e), claiming that a conspiracy existed between Davis, Brooks and Mark Gilliam. However, the State's argument on appeal is without merit because to qualify under the co-conspirator exception of section 90.803(13)(e), a statement must be made during the course of the conspiracy and in furtherance of it. See § 90.803(18)(e), Fla. Stat. (1997); see also Foster v. State, 679 So.2d 747 (Fla.1996). There is simply no record evidence even suggesting that at the time most of the *773 above statements were made any conspiracy existed. In fact, the evidence is to the contrary and demonstrated that if any conspiracy existed it was formed shortly before the murders.[4]
The State contends that these statements should be admitted even though they were made by Davis because of the close and inseparable connection between Brooks and Davis during Brooks' visit and stay in Florida. However, by this argument the State is ignoring the limitations of the co-conspirator hearsay exception of section 90.803(13)(e), which requires (1) that these statements be made during and in furtherance of a conspiracy, and (2) that independent evidence establish the conspiracy before the statements are allowed. The trustworthiness and rationale behind the co-conspirator hearsay exception is "that a person who has authorized another to speak or to act to some joint end will be held responsible for what is later said or done by his agent, whether in his presence or not." United States v. Trowery, 542 F.2d 623, 626 (3d Cir.1976). As noted, at the time the above statements were made, there was no evidence of a conspiracy or that one would occur; therefore, those statements are devoid of the requisite trustworthiness contained in the co-conspirator exception. The statements are clearly hearsay not covered by any other recognized exception to the hearsay rule.
As earlier noted, it is clear that section 90.803(3) allows the admission of a declarant's statements to prove only the declarant's state of mind or to explain or prove only the declarant's subsequent conduct. See, e.g., Jones v. State, 440 So.2d 570, 577 (Fla.1983); Bailey. Therefore, this rule also renders Davis's statements inadmissible to prove Brooks' intent and motive. See, e.g., Sandoval v. State, 689 So.2d 1258 (Fla. 3d DCA 1997). In Sandoval, the defendant sought to introduce her codefendant's statements to show the defendant's state of mind and to explain her actions. The trial court sustained the State's objection to the introduction of the evidence. On appeal, the Third District agreed with the trial court and held:
[S]ection [90.803(3)] permits the admission of a declarant's statements to prove the declarant's state of mind or explain the declarant's subsequent conduct. See e.g., Jones v. State, 440 So.2d 570, 577 (Fla.1983). The declarant here, is the co-defendant and not Sandoval.
Id. at 1259. As in Sandoval, the trial court here should not have allowed Davis's statements to be used against Brooks to establish motive, absent any evidence of a conspiracy at the time the statements were made.
Therefore, we find the trial court abused its discretion in admitting Davis's numerous statements to Samms, Johnson, Sievers, and Mantheny, and Brooks was substantially prejudiced as a result.[5]

*774 Statements Against Interest
Next, Brooks alleges that his Sixth Amendment right to confront the witnesses against him was violated when the trial court admitted statements made by Davis to agent Dennis Haley prior to his arrest. We agree.
After the murders, but prior to his arrest, Davis was interviewed by investigators on several occasions. In his first two interviews, Davis denied even being in Crestview on the night of the murders. However, in a subsequent interview on the Monday after the murders and after being confronted with evidence placing him in Crestview, he admitted driving to Crestview with Carlson on the night of the murders. At trial, the State sought to introduce six statements under the "statements against interest exception" to the hearsay rule, made by Davis to the investigator on that day to show that Brooks was with Carlson and Davis in the car on the night of the murders. These six statements were: (1) admitting that Davis was in Crestview on the night of the murders; (2) that he and Brooks drove there with Carlson on the night of the murders; (3) that they arrived around 9 p.m.; (4) that the murders occurred shortly after they arrived; (5) that Davis was in the car when the murders occurred; and (6) that a glove was worn during the murders. The trial judge allowed in evidence the statements that Davis drove to Crestview with Carlson on the night of the murders and the time that they arrived. As a result, Lt. Jerome Worley testified that Davis admitted driving to Crestview on the night of the murders with Carlson and that they arrived there around 9 p.m. He also testified to the jury that immediately after the interview during which these statements were made, not only was Davis arrested, but an arrest warrant was immediately prepared for the arrest of Brooks.
Section 90.804(2)(c) provides:
(2) HEARSAY EXCEPTIONS.The following are not excluded under s. 90.802, provided that the declarant is unavailable as a witness:
. . . .
(c) Statement against interest.A statement which, at the time of its making, was so far contrary to the declarant's pecuniary or proprietary interest or tended to subject the declarant to liability or to render invalid a claim by the declarant against another, so that a person in the declarant's position would not have made the statement unless he or she believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement.[6]
§ 90.804(2)(c), Fla. Stat. (1995). "The reliability of these statements flows from the fact that they are against the interest of the declarant at the time when they are made [as well as the presumption that a] person does not make statements which will subject him or her to civil or criminal sanctions unless they are true." Charles W. Ehrhardt, Florida Evidence § 804.4 (2000 ed.); see also Williamson v. United States, 512 U.S. 594, 599, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) ("Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to *775 make self-inculpatory statements unless they believe them to be true.").[7]
The trial judge here had some reservations concerning the admissibility of Davis's statements because he felt that although Davis admitted driving to Crestview with Carlson on the night of the murders and being present in the car at the time of the murders, Davis was actually trying to shift the blame to Brooks in his statement. On this issue, the U.S. Supreme Court has pointed out:
The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature.
... And when part of the confession is actually self-exculpatory, the generalization on which Rule 804(b)(3) is founded becomes even less applicable. Self-exculpatory statements are exactly the ones which people are most likely to make even when they are false; and mere proximity to other, self-inculpatory, statements does not increase the plausibility of the self-exculpatory statements.
Williamson, 512 U.S. at 599-600, 114 S.Ct. 2431. Therefore, assuming the other requirements of section 90.804(2)(c) are met, it follows that a nontestifying codefendant or accomplice's confession or inculpatory statement which also implicates the defendant should only be admitted if it "sensibly and fairly can be redacted to include only those statements which are solely self-in-culpatory." Franqui v. State, 699 So.2d 1332, 1339 (Fla.1997) (Anstead, J., concurring in part and dissenting in part).
Just recently, the United States Supreme Court comprehensively addressed this issue in Lilly v. Virginia, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). In Lilly, the defendant, his brother Mark, and Gary Barker, were arrested after a two-day crime spree by the three which included stealing liquor and guns and resulted in the abduction of Alex De-Filippis. DeFilippis was later shot and found dead. During police questioning, Mark admitted stealing the alcoholic beverages, but claimed that the defendant and Barker stole the guns and that the defendant shot DeFilippis. At defendant's trial, the State of Virginia called Mark as a witness and sought to have him testify to the statements that he made to the police. The State subsequently was allowed to introduce the statements as declarations against interest of an unavailable witness.[8] On appeal, the Virginia Supreme Court approved the admission of the statements. The United States Supreme Court accepted certiorari on the issue of whether introduction of this testimony violated Lilly's Sixth Amendment right to confront the witnesses against him, and reversed the Virginia decision. The Court held:
The decisive fact, which we make explicit today, is that accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence.
*776 Id. at 134, 119 S.Ct. 1887. The Court also explained:
It is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old ex parte affidavit practicethat is, when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing.
Id. at 137, 119 S.Ct. 1887. Applying these principles, the Court held it was error to admit Mark's statements even though other evidence at trial corroborated portions of Mark's statements and even though the police had informed him of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[9]See id. at 137-38, 119 S.Ct. 1887.
Accordingly, the Court concluded that neither the words that Mark spoke nor the setting in which he was questioned provided any basis for concluding that his comments regarding petitioner's guilt were so reliable that there was no need to subject them to adversarial testing in a trial setting. See id. at 139, 119 S.Ct. 1887. Moreover, the Court held that Mark was primarily responding to the officer's leading questions, and thus, "Mark had a natural motive to attempt to exculpate himself as much as possible." Id. Finally, the Court remanded the case to the state court to determine whether the error in admitting the statements was harmless beyond a reasonable doubt. See id. at 140, 119 S.Ct. 1887.
As noted by Ehrhardt, although Lilly may not have established an absolute rule of inadmissibility of a non-testifying accomplice's confession as a declaration against penal interest when used by the prosecution, the Court gave no indication of any specific factors that could establish sufficient reliability to admit the statements and satisfy the defendant's protections under the Sixth Amendment. See Ehrhardt, supra, § 804.4. In fact, the opinion makes it highly unlikely that a prosecutor will be able to establish "particularized guarantees of trustworthiness." See id. The opinion also left unanswered the question of whether it would be appropriate to introduce solely those statements that directly inculpate the declarant as was done by the trial judge in this case. However, the Court in Williamson clearly stated: "[T]he fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability. We see no reason why collateral *777 statements, even ones that are neutral as to interest, should be treated any differently from other hearsay statements that are generally excluded." 512 U.S. at 600, 114 S.Ct. 2431 (citation omitted).
In the instant case, Brooks raises a Confrontation Clause objection as did the defendant in Lilly. Moreover, the trial judge concluded, and we agree, that Davis's statements to the police were made with "the tenor" of shifting blame from himself to Brooks since they were made pursuant to extensive questioning by police and after Davis was confronted with inculpatory evidence. As a result, we conclude that even though several of Davis's statements were self-inculpatory when considered on their own, when viewed in conjunction with his other statements and under the circumstances in which they were made, it is obvious they were predominantly self-serving in attempting to shift blame, and thus lacked the necessary "guarantees of trustworthiness."[10]
Moreover, Lt. Worley testified that immediately after Davis made those statements, an arrest warrant was prepared for Brooks. Finally, the State specifically relied and focused on these statements when in closing argument, the prosecutor improperly informed the jury they had not heard everything Davis had told Agent Haley in that interview, the obvious inference being there was more damaging evidence than what had been presented. Accordingly, it was error to admit them. See Lilly; Williamson; Franqui v. State, 699 So.2d 1332, 1335 (Fla.1997) (finding that codefendant's confession was substantially incriminating to defendant and that the circumstances of codefendant's confession did not demonstrate the particularized guarantee of trustworthiness sufficient to overcome the presumption of unreliability that attaches to accomplices' hearsay confessions implicating the defendant).

Co-conspirator Hearsay Exception
Brooks also argues that the trial court erred in admitting other statements made by Davis under the co-conspirator hearsay exception because the State failed to prove the existence of a conspiracy. At trial, Mark Gilliam testified that on the Monday evening before the murders, Davis had said that a woman was pestering him for money, that she should be killed in the ghetto and that he would choke her. In response to Davis's statements, Gilliam testified that Brooks suggested that she should be shot, but then Gilliam himself interjected that she should be stabbed instead. He also testified that Davis offered to pay him $500 for driving them to Crestview to kill Carlson because it was a slow town, and that Brooks would get paid between $4000 and $8000 for his participation. On cross-examination, Gilliam testified that he thought none of these statements were serious and the discussion was all a joke.
Additionally, Brooks alleges that even assuming the existence of a conspiracy, the trial court erred in allowing Davis's statements made to Rochelle Jones after the murders had occurred. At trial, Jones testified that after the murders, Davis confronted her on several occasions and told her, "You ain't seen me" and asked her whether she was "still cool." Moreover, on Saturday evening after the murders, she testified that Davis had told her that "they [Brooks and Davis] had went out there [Crestview] to rob this guy and that they shot at him and they took his money and *778 they said that the guy probably killed Rachel because she had set him up." Finally, Brooks alleges that the trial court erred in allowing Officer Glenn Barberree to testify about the contents of his interview with Davis after the murders. Over Brooks' objection, Barberree testified that Davis had told him that he was at his home in Eglin with Brooks on the evening of the murders. As with Jones' statements, the trial court admitted this testimony under the co-conspirator exception to the hearsay rule. The State contends that the testimony of these witnesses was properly admitted under the co-conspirator exception to the hearsay rule. We must again review that exception.
Section 90.803(18)(e) provides that "[a] statement by a person who was a co-conspirator of the party [made] during the course and in furtherance of the conspiracy" is not inadmissible as evidence even though the declarant is unavailable as a witness. In order to admit evidence under this exception, the State must establish:
(1) that a conspiracy existed; (2) that the declarant/coconspirator and the defendant against whom the statements are offered were members of the conspiracy; and (3) that the statements were made during the course and in furtherance of the conspiracy.
State v. Edwards, 536 So.2d 288, 292 (Fla. 1st DCA 1988); see also Charles W. Ehrhardt, Florida Evidence § 803.18e (2000 ed.). The State must prove the existence of the conspiracy and each member's participation in it by a preponderance of the evidence independent of the hearsay statements sought to be admitted. See Foster v. State, 679 So.2d 747, 753 (Fla.1996).
In the instant case, we conclude that a review of the record reflects sufficient independent evidence to establish a conspiracy between Gilliam, Davis and Brooks beginning on the Monday evening after their return from Atlanta. In addition to the statements already discussed, Gilliam also testified that he witnessed Brooks and Davis try on some latex gloves that evening to see if they fit and that he saw a "buck knife" on the speaker of the stereo. He also testified concerning his own statements that they should stab Carlson, and Brooks' testimony that she should be shot. We conclude that this evidence was sufficient to establish their intent to conspire to kill Carlson.
Additionally, independent and direct evidence placed Brooks and Davis together in Crestview on the night of the murders. Therefore, we conclude that the trial court did not err in finding that the State met its burden of proving by a preponderance of the evidence the existence of a conspiracy to murder Carlson, and as a result, we agree that the statements Davis made in furtherance of the conspiracy in the presence of Gilliam and Brooks were properly admitted by the trial court. See Larzelere v. State, 676 So.2d 394, 406 (Fla.1996) (holding that defendant's calculated plan to murder the victim involving conspirational association with her son was sufficient to establish the existence of a conspiracy and made her son's hearsay statements admissible against the defendant under section 90.803(18)(e)); Romani v. State, 542 So.2d 984, 986 (Fla.1989) (holding that sufficient evidence existed to find that a conspiracy existed for purposes of section 90.803(18)(e) where co-conspirator's statement that defendant offered to pay $10,000 to anyone who would commit the murder was corroborated by evidence that the defendant withdrew $10,000 from her bank account, deposited it into another account and later withdrew it again).
Notwithstanding the finding of a conspiracy, however, we find it was error *779 to admit Davis's statements to Jones and Barberree made after the murders. As noted previously, to be admissible under section 90.803(18)(e), statements must be made during and in furtherance of the conspiracy. Florida courts have consistently held that for purposes of section 90.803(18)(e), a conspiracy ordinarily ends when the crime has been committed. See, e.g., Calvert v. State, 730 So.2d 316, 319 (Fla. 5th DCA 1999); Burnside v. State, 656 So.2d 241, 245 (Fla. 5th DCA 1995); Usher v. State, 642 So.2d 29, 31 (Fla. 2d DCA 1994); Moore v. State, 503 So.2d 923, 924 (Fla. 5th DCA 1987); Wells v. State, 492 So.2d 712, 719 (Fla. 1st DCA 1986). The State has demonstrated no basis in the record for a contrary holding here.
In Wells, the First District specifically held that "statements made which tend to shield `coconspirators' after the objective of the conspiracy is completed do not give rise to an additional conspiracy to cover up the original crime." Id. at 719 (citing Krulewitch v. United States, 336 U.S. 440, 444, 69 S.Ct. 716, 93 L.Ed. 790 (1949)). Applying this rule, the First District held that the trial court had erred in admitting statements under section 90.803(18)(e) that were made after the crimes were committed in the absence of evidence demonstrating that the statements were made during the continuation of the conspiracy and the agreement it encompassed. As a result, the admission of Davis's statements to Jones and Barberree was error.

Cumulative Analysis
Our faith in the judicial system in this country is deeply rooted in the adversarial nature of its legal proceedings, especially in the criminal system where every defendant has the constitutional right and guarantee to confront the witnesses and evidence presented against him. Here, the erroneous admission of evidence under numerous hearsay exceptions denied Brooks the opportunity to cross-examine and otherwise challenge critical and damaging testimony and evidence. Further, in light of the circumstantial nature of the evidence against Brooks and the State's substantial reliance on the hearsay evidence, we find that the State has failed to demonstrate beyond a reasonable doubt that the admission of this inadmissible hearsay "did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986).
Our review of the record in light of the State's theory at trial as well as the circumstantial nature of the evidence against Brooks establishes that the cumulative effect of the numerous errors discussed above in the admission of improper hearsay unfairly prejudiced Brooks. In the instant case, the State's admitted theory at trial was to show that Davis and Brooks were inseparable in the days leading up to the murders. In fact, in its opening argument, the State referred to them as "siamese twins." Thereafter, through the admission of numerous hearsay statements, the State sought to impute Davis's actions, statements, motive and intent to Brooks. This is particularly troublesome in this case where the trial court itself struggled with the admissibility of this evidence and concluded that this case was being tried on the basis of numerous hearsay exceptions. As such, the admission of this evidence constituted reversible error. See, e.g., Selver v. State, 568 So.2d 1331 (Fla. 4th DCA 1990); Bailey v. State, 419 So.2d 721 (Fla. 1st DCA 1982).
In Bailey for example, the court held that hearsay statements admitted under section 90.803(3), which tended to establish a motive for the defendant to have committed the homicide, could not be deemed harmless where the State's evidence was *780 almost wholly circumstantial. See id. at 722. In Brooks' case, most of the evidence against Brooks was circumstantial and there was no physical evidence linking him to the murders or crime scene. Additionally, although Mark Gilliam testified as to Brooks' financial motive, Gilliam was heavily impeached at trial and he testified that he thought it was all a joke. In fact, Gilliam subsequently recanted his trial testimony, although he later reaffirmed it. The other evidence against Brooks came from a jailhouse informant who received a very favorable plea bargain from the State in his own murder case in exchange for his testimony against Brooks. Moreover, the statements by Davis introduced as statements against interest were also highly prejudicial. Further, in referring to these statements, the State specifically told the jury during closing arguments that they did not hear everything Davis said to the police on that night. This was clearly improper and illustrates the State's attempt to inform the jury of the precise nature of the statements that the trial judge tried to conceal from the jury and reflects the dangers which the United States Supreme Court warned about in Lilly. Accordingly, we conclude that the State has not demonstrated beyond a reasonable doubt that the error "did not contribute to the verdict or alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." DiGuilio, 491 So.2d at 1135.

STRIKE VENIRE AND CHANGE OF VENUE
Because some other issues may occur on retrial we resolve several other claims of error by Brooks. Brooks argues that the trial court erred in denying his motions to strike the venire and change venue because the pretrial publicity in this case denied Brooks a fair and impartial trial.
This Court has provided the following test to determine whether a change of venue is necessary because of pretrial publicity:
The test for determining change of venue is whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and the accompanying prejudice, bias, preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom.
Rolling v. State, 695 So.2d 278, 284 (Fla. 1997) (quoting McCaskill v. State, 344 So.2d 1276, 1278 (Fla.1977)). Before ruling on such a motion, trial courts are ordinarily permitted to attempt to empanel a jury. See Henyard v. State, 689 So.2d 239, 245 (Fla.1996). This process provides trial courts with an opportunity to determine through the voir dire examination of prospective jurors whether it is actually possible to find individuals who have not been so infected by the pretrial publicity that they are unable to independently review the evidence at trial. See Rolling, 695 So.2d at 285. To be qualified as a juror, a person need not be completely ignorant of the facts of the case. See id. Rather, the issue may turn on the nature and extent of the pretrial information the juror has acquired and an analysis as to whether a juror "can lay aside his impression or opinion" based upon any pretrial information and "render a verdict based on the evidence presented in court." Id. (quoting Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)). As with other pretrial motions, "[a] motion for change of venue is addressed to the trial court's discretion and will not be overturned on appeal absent a palpable abuse of discretion." Cole v. State, 701 So.2d 845, 854 (Fla.1997).
*781 Admittedly, most jurors called in the instant case had some knowledge about the case. However, in response, the trial judge conducted individual voir dire regarding pretrial publicity and the jurors' views on the death penalty. Importantly, the record reflects that the trial court liberally granted Brooks' challenges for cause to those jurors who indicated that because of their exposure to the case, they might have had difficulty giving Brooks a fair trial. Finally, as noted by the State, all jurors who eventually sat on Brooks' case assured the court that their prior knowledge would not affect their impartiality and that they could decide the case solely on the evidence presented and the instructions given by the court. Therefore, we find no abuse of discretion in denying Brooks' motion to change the venue to another location. See Cole, 701 So.2d at 853-54.

PHOTOGRAPHS
Brooks also argues that the trial court erred in admitting five autopsy photographs of the victims introduced during the medical examiner's testimony alleging that the probative value of the photos was substantially outweighed by their prejudice. At trial, Dr. Joan Wood testified concerning the autopsy she conducted in Oregon before and after the victims' funeral. Although she conceded that it was difficult to examine the victims because of the first autopsy that had been performed and since many of the wounds had already been stitched, she nevertheless was able to testify about injuries to Carlson that were not apparent at the first autopsy, done less than twenty-four hours after the murders. Pursuant to her autopsy, Dr. Wood concluded that Carlson had been choked as well as stabbed. Moreover, she testified that the photographs of the original autopsy did not depict numerous defensive stab wounds on the victim's hands and arms. In fact, of the multiple stab wounds inflicted on Carlson, Dr. Wood testified that eighteen of them were defensive and reflected that many of the injuries and stab wounds occurred while Carlson was still alive.
We have consistently held that the initial test for determining the admissibility of photographic evidence is relevance, not necessity. See Mansfield v. State, 758 So.2d 636 (Fla.2000). Photographs are admissible if "they assist the medical examiner in explaining to the jury the nature and manner in which the wounds were inflicted." Bush v. State, 461 So.2d 936, 939 (Fla.1985). Moreover, photographs are admissible "to show the manner of death, location of wounds, and the identity of the victim." Larkins v. State, 655 So.2d 95, 98 (Fla.1995). On the other hand, trial courts must be cautious in not permitting unduly prejudicial or particularly inflammatory photographs before the jury. However, a trial court's decision to admit photographic evidence will not be disturbed absent an abuse of discretion. See Mansfield, 758 So.2d at 648.
In the instant case, three of the five photographs objected to by Brooks showed the defensive wounds on Carlson's hands and arms that Dr. Wood testified to. Moreover, the other two photographs depicted bruises and hemorrhaging that were not readily apparent from the first autopsy. As such, we conclude the photographs in question were relevant to Dr. Wood's determination as to the manner of Carlson's death. Accordingly, we find that the trial court did not abuse its discretion in admitting the photographs.

CONCLUSION
Because of the prejudicial nature of the extensive inadmissible hearsay testimony introduced at trial, we reverse Brooks' *782 convictions and sentence imposed, and remand for a new trial.
It is so ordered.
SHAW, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
WELLS, C.J., concurs in part and dissents in part with an opinion.
HARDING, J., concurs in part and dissents in part with an opinion.
WELLS, C.J., concurring in part, dissenting in part.
I write separately today because of my concern that the majority does not adhere to this Court's on-point precedent regarding a nontestifying declarant's statement that inculpates both the declarant and accused as established in Franqui v. State, 699 So.2d 1312 (Fla.1997) (Franqui I). Based upon that precedent, I depart from the majority over the admissibility of two statements which the trial court admitted but the majority finds inadmissible. However, I concur with the majority that a reversal is required here because the other errors described by the majority are not harmless beyond a reasonable doubt. See id. at 1322.
My disagreement with the majority is over the proffered statements that Davis made to Agent Haley and then Lieutenant Worley.[11] The trial court found four of the six proffered statements inadmissible because those statements were untrustworthy in that they impermissibly shifted blame to Brooks. The trial court found the other two statements as redacted were sufficiently trustworthy and thus admissible.[12] As the majority correctly notes, these two admitted statements were purely self-inculpatory from Davis's perspective after redaction. See Majority op. at 777.
The real issue here is whether, in a trial separate from the trial of another codefendant, a statement made by a nontestifying codefendant declarant may be admitted when properly redacted to include only those statements that are purely self-inculpatory from the declarant's perspective.[13] I do not read a direct answer to this question in the majority opinion. My conclusion is that the statement is admissible if relevant.
*783 The Supreme Court interpreted the federal statement against interest rule[14] very narrowly to allow only those purely self-inculpatory statements to be admitted under the exception. See Williamson v. United States, 512 U.S. 594, 600, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). However, the Supreme Court's interpretation of the federal exception was not based upon the Confrontation Clause; rather, the decision was based on the Supreme Court's construction of the federal hearsay rules. See id. The Supreme Court wrote, "Congress certainly could, subject to the constraints of the Confrontation Clause, make statements admissible based on their proximity to self-inculpatory statements." Id. Thus, there is no Sixth Amendment requirement that Florida must read its statement against interest exception as narrowly as the federal judiciary reads its own exception.
This Court has not explicitly approved of such a narrow definition for our reading of the term "statement" in Florida's statement against interest exception.[15] I do not agree with Professor Ehrhardt's[16] analysis of our case law on this point. Nor is such a narrow reading required by the Confrontation Clause. See Williamson, 512 U.S. at 600, 114 S.Ct. 2431. In any event, even is we were to assume that Florida followed the federal court in reading Florida's statement against interest exception narrowly, the two statements at issue would still be admissible.
This Court in Franqui I noted that Williamson would authorize the introduction of those portions of a statement that are purely self-inculpatory from the declarant's perspective. See Franqui I, 699 So.2d at 1320. In fact, in Williamson, the Supreme Court remanded the case for the lower courts to examine the hearsay statements at issue there to determine which portions of the hearsay statements were self-inculpatory and thus were properly admitted. See Williamson, 512 U.S. at 604, 114 S.Ct. 2431. It naturally follows that a trial court may redact a declarant's statement and admit only those statements which are purely self-inculpatory from the declarant's perspective. See id.; Franqui I, 699 So.2d at 1340.
Here, there is no question that the trial judge sifted through the six proffered statements and admitted the two statements *784 that were self-inculpatory from Davis's perspective.[17] The prosecution proffered Davis's statement, and the trial court carefully carved out the self-inculpatory portions of Davis's statement. The trial court properly denied admission to those statements that shifted blame to Brooks. The majority agrees that the two admitted statements as redacted were self-inculpatory from Davis's perspective. See Majority op. at 777. These two self-inculpatory statements as redacted were against Davis's penal interest; thus, these statements fall under section 90.804(2)(c), Florida Statutes.
The majority's reliance upon a concurring and dissenting opinion in Franqui II is misplaced, especially in light of this Court's extensive analysis in Franqui I, decided one week prior to Franqui II, that reached a conclusion contrary to that of today's majority. I would conclude that the two statements at issue were properly admitted under Franqui I. Because I believe this Court should remain true to its precedent, I would allow these two statements to be admitted upon remand under authority of Franqui I.
HARDING, J., concurring in part and dissenting in part.
I agree with the majority that Brooks is entitled to a new trial based upon the prejudicial errors that occurred here. However, I do not agree with the majority that the admission of statements by Brooks' accomplice Davis constituted error in this case.
The majority concludes that Brooks' Sixth Amendment right to confront witnesses was violated when the trial court admitted several statements against interest made by Davis to a law enforcement investigator prior to his arrest. The trial court excluded any statements that implicated Brooks in the murder or made any reference to Brooks. The court only allowed in evidence statements that Davis drove to Crestview with the victim on the night of the murders and that they arrived at 9 p.m. The law enforcement agent who testified as to these hearsay statements against interest also testified that after these statements were made Davis was arrested and a warrant was prepared for the arrest of Brooks.
The majority relies upon a recent plurality opinion by the United States Supreme Court, see Lilly v. Virginia, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999), to conclude that it was error to admit Davis's statements because they were "predominantly self-serving in attempting to shift blame [to Brooks], and thus lacked the necessary `guarantees of trustworthiness.'" Majority op. at 777. I do not believe that Lilly is applicable to the instant case. As noted above, Lilly was a plurality opinion and the language from Lilly cited in the majority's opinion did not garner a majority of the Supreme Court. The one thing that a majority of the Supreme Court did agree on in Lilly was that the "admission of the untested confession of [the accomplice] violated the petitioner's Confrontation Clause rights." 527 U.S. at 139, 119 S.Ct. 1887. As Justice *785 Scalia explained in his separate opinion, the "[accomplice] told police officers that [Lilly] committed the charged murder" and the "prosecution introduced a tape recording of these statements at trial without making [the accomplice] available for cross-examination. In my view, this is a paradigmatic Confrontation Clause violation." Id. at 143, 119 S.Ct. 1887 (Scalia, J., concurring in part and concurring in the judgment). The instant case hardly compares to Lilly. The trial court did not allow in statements which facially implicated Brooks in the murders. In fact, the court redacted the statements to remove any reference to Brooks.
In my mind this case is controlled by Richardson v. Marsh, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), in which the Supreme Court held that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when the confession is redacted to eliminate not only that defendant's name, but any reference to his or her existence. See also United States v. Vogt, 910 F.2d 1184, 1191-92 (4th Cir.1990) (declining to extend Bruton's[18] protection where defendant's name was redacted from nontestifying codefendant's statement which incriminated defendant by inference).
The statements admitted by the trial court here are the same type of statements that were found admissible in Richardson: they did not implicate Brooks on their face, and in fact did not even make any reference to him; the statements only became incriminating when linked with other evidence introduced at trial.
In Richardson the Supreme Court specifically declined to extend Bruton's protection to circumstances where a defendant's name is redacted, even though the statement's application to defendant is linked up by other evidence properly admitted against the defendant. The Court explained that if Bruton were extended to confessions incriminating by connection (as opposed to confessions incriminating on their face), then it would be impossible to predict the admissibility of a confession in advance of trial. 481 U.S. at 209, 107 S.Ct. 1702. The Court warned that such a "contextual implication doctrine" would lend itself to manipulation by the defense and, even without manipulation, would result in numerous mistrials and appeals. Id. In a subsequent opinion, the Supreme Court further explained that Richardson depends "in significant part upon the kind of, not the simple fact of, inference. Richardson's inferences involved statements that did not refer directly to the defendant himself, and which became incriminating `only when linked with evidence introduced later at trial.'" Gray v. Maryland, 523 U.S. 185, 196, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998) (holding that confession which substituted blanks and the word "delete" for the defendant's proper name falls within the class of statements to which Bruton's protections apply).
However, I do agree with the majority that it was improper for the prosecutor to inform the jury that they had not heard everything that Davis had told the investigator in his interview, thereby implying that there was more damaging evidence than what had been presented. See majority op. at 777. Indeed, the Supreme Court found it significant that the confession at issue in Richardson omitted all reference to the defendant, as well as any indication that anyone other than the speakers had participated in the crime, and did not show that it had been redacted. See Richardson, 481 U.S. at 203, 107 S.Ct. 1702; Gray, 523 U.S. at 196-197, 118 *786 S.Ct. 1151. On retrial I would warn the prosecutor that reference to the inadmissible portions of Davis's statements could result in a Confrontation Clause violation.
NOTES
[1] DNA tests performed after the murders revealed that Davis was not the father.
[2] These issues are: (1) error in applying the state of mind hearsay exception; (2) error in applying the co-conspirator hearsay exception; (3) error in admitting codefendant's statements under the statement against interest hearsay exception; (4) error in dismissing recanted testimony from the State's two main witnesses; (5) error in allowing bargained for testimony; (6) error in allowing improper comments during closing arguments; (7) error in failing to dismiss certain jurors, in allowing others to sit as jurors, and in allowing an improper comment to the jury during jury selection; (8) improper admission of photographs; (9) failure to strike the venire and change venue; (10) error in admitting codefendant's statements to Officer Barberree under the co-conspirator hearsay exception; (11) error in denying motion for judgment of acquittal; (12) improper application of aggravating factors; (13) error in finding and weighing mitigating evidence; (14) error in allowing the introduction of victim impact evidence; and (15) error in finding death sentence proportional.
[3] At trial, Brooks objected to statements Davis made to Sievers a few days after the murders to the effect that if Davis had killed the victims, he would have shot them rather than stab them. The State sought to introduce these statements under the state of mind exception of section 90.803(3)(a) to show that even though his baby had just been killed, Davis nevertheless was talking about how he would have done it. Because of this indifference toward the victims, the State maintained that he could have easily been involved in the murders, and by association, Brooks as well. However, the trial judge denied the admission of these statements claiming that the prejudicial nature of these statements outweighed their probative value in showing that Davis did not have a great deal of concern for his baby. We agree with the trial court's ruling on this issue.
[4] We have held that evidence of a defendant's desire or intent can be relevant when used to establish motive for a murder. See Walker v. State, 707 So.2d 300, 310 (Fla. 1997). In Walker, in order to help establish the defendant's motive for the murders of his ex-girlfriend and his son, the State sought to introduce evidence of Walker's desire that the victim abort their child. However, in contrast to Walker, the statements here were not made by Brooks, but by Davis, and they provided a motive directly for Davis, not Brooks. Notwithstanding, the State improperly sought to use them to impute Davis's motive to Brooks.
[5] It is not clear from the record whether the statements to Sievers were made before or after the murders. To the extent they were made before the murders, it was also error to introduce them. However, we find that it was not error to admit Davis's statements to Jones since they were made during the alleged conspiracy.
[6] Although the rule itself only requires corroboration for exculpatory statements, it has been held that inculpatory statements must also be supported by corroborating circumstances which clearly indicate the trustworthiness of the statements. See Maugeri v. State, 460 So.2d 975, 977 n. 3 (Fla. 3d DCA 1984) (citing United States v. Riley, 657 F.2d 1377, 1383 (8th Cir.1981)).
[7] Rule 804(b)(3) of the Federal Rules of Evidence is the federal counterpart to section 90.804(2)(c) and is practically identical in its content.
[8] Mark was unavailable as a witness because he invoked his Fifth Amendment privilege against self-incrimination. In the present case, Davis also invoked his Fifth Amendment right against self-incrimination; therefore, he was also deemed unavailable.
[9] On the issue of which court was the appropriate court to rule on the statements' admissibility, the court stated:

Nothing in our prior opinions, however, suggests that appellate courts should defer to lower courts' determinations regarding whether a hearsay statement has particularized guarantees of trustworthiness. To the contrary, those opinions indicate that we have assumed, as with other fact-intensive, mixed questions of constitutional law, that "[i]ndependent review is ... necessary ... to maintain control of, and to clarify, the legal principles" governing the factual circumstances necessary to satisfy the protections of the Bill of Rights. Ornelas v. United States, 517 U.S. 690, 697 [, 116 S.Ct. 1657, 134 L.Ed.2d 911] (1996).... [T]he surrounding circumstances relevant to a Sixth Amendment admissibility determination do not include the declarant's in-court demeanor (otherwise the declarant would be testifying) or any other factor uniquely suited to the province of trial courts. For these reasons, when deciding whether the admission of a declarant's out-of-court statements violates the Confrontation Clause, courts should independently review whether the government's proffered guarantees of trustworthiness satisfy the demands of the Clause.
Id. at 136-37, 119 S.Ct. 1887.
[10] In fact, the State conceded that its purpose for introducing Davis's statements, even those that only seemed to inculpate Davis, was to show that Brooks must have also been involved under the State's theory throughout the trial that Brooks and Davis were inseparable.
[11] The six statements made by Davis at issue are: (1) Davis admitted he was in Crestview the night of murders; (2) Carlson drove Davis and Brooks to Crestview that night; (3) Brooks, Davis, and Carlson arrived in Crestview at about 9 p.m.; (4) the murders occurred shortly after their arrival; (5) Davis was in the car when the murders were committed; and (6) a glove was worn during the murders.
[12] The two statements admitted by the trial court are: (1) Davis and Carlson drove to Crestview that night; and (2) Davis and Carlson arrived in Crestview about 9 p.m.
[13] The majority undertakes a lengthy analysis of the plurality opinion in Lilly v. Virginia, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). It should be noted, however, that Lilly is a plurality opinion. The majority cites to Lilly for the proposition that "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." Majority op. at 775 (quoting Lilly, 527 U.S. at 134, 119 S.Ct. 1887). This Court previously had arrived at this conclusion. See Franqui I, 699 So.2d at 1319.

In Franqui I, this Court found that a nontestifying declarant's statement or confession that inculpated both the declarant and the accused was not within a firmly-rooted hearsay exception. See id. at 1319. Thus, under Franqui I, a nontestifying declarant's hearsay statement which inculpates both the declarant and accused can only be admitted upon a showing that "the totality of the circumstances in which ... [the statement or] confession was made makes the statement inherently trustworthy and renders the declarant particularly worthy of belief." Id. at 1319.
[14] See Fed. Rule Evid. 804(b)(3).
[15] See § 90.804(2)(c), Fla. Stat. (1995).
[16] See Charles W. Ehrhardt, Florida Evidence § 804.4, at 826 (2000). Ehrhardt states:

The Florida Supreme Court has cited with approval [footnote 15 citing Franqui v. State, 699 So.2d 1332 (Fla.1997)] Williamson v. United States, in which the United States Supreme Court narrowly construed Federal Rule 804(b)(3) so that only those declarations or remarks within a confession that "are individually self-incriminatory" are included within the exception as a statement against penal interest.
Ehrhardt, supra at 826 (second footnote omitted).
I do not agree with Professor Ehrhardt's commentary as to Franqui v. State, 699 So.2d 1332 (Fla.1997) (Franqui II). The majority in Franqui II never cited to Williamson. In fact, one week prior to deciding Franqui II, this Court decided Franqui I. In Franqui I, this Court provided extensive analysis regarding redacting codefendants' statements. See Franqui I, 699 So.2d at 1317. There, this Court reviewed Williamson, but the majority did not hold that Florida would require a narrow reading of our statement against interest exception. See Franqui I, 699 So.2d at 1320.
Justice Anstead did hold that view in his separate opinion in Franqui I and acknowledged his view was different than the majority's: "I disagree with much of the majority's framework for analyzing Franqui's claim that his right to confront the witnesses against him was violated in this case...." Franqui I, 699 So.2d at 1329 (Anstead, J., concurring in part and dissenting in part).
[17] This issue normally rises in a joint trial situation where the declarant, a codefendant, makes a hearsay statement inculpating both the defendant and the declarant codefendant. The redacted statement is usually admitted only against the codefendant declarant and not against the defendant. Here, the defendant was tried separately from Davis, the declarant. Thus, the trial court first had to determine whether the declarant's statement as redacted was even relevant against the defendant. The normal relevance test applied. Here, the trial court found the two statements relevant when it allowed Davis's two redacted statements to come before the jury.
[18] Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).