855 So.2d 1 (2003)
John Calvin TAYLOR, II, Appellant,
v.
STATE of Florida, Appellee.
No. SC96959.
Supreme Court of Florida.
June 5, 2003.
Rehearing Denied September 8, 2003.
*9 Nancy A. Daniels, Public Defender, and Nada M. Carey, Assistant Public Defender, Second Judicial Circuit, Tallahassee, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Charmaine M. Millsaps, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
John Calvin Taylor, II, appeals his conviction of first-degree murder and his sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm Taylor's convictions and sentences for first-degree murder and robbery with a deadly weapon.

MATERIAL FACTS
John Calvin Taylor, II (Taylor), was tried and convicted for the robbery and murder of Shannon Holzer (Holzer). The evidence presented at trial showed Jeff Holzer, the victim's husband, arrived home early on the morning of December 30, 1997, and became concerned because his wife was not at home. After calling the police and local hospitals to see if any accidents had been reported, he called the police to report his wife missing. Later that evening, Holzer's vehicle was discovered stuck in the mud on a fire break road in a wooded area. Holzer's body was discovered a short time later off the road in the woods. She had been stabbed nine times in the abdomen and upper chest. *10 Holzer's clothing, including her pants and underwear, had been partially removed.
At trial, a forensic pathologist, Dr. Bonifacio Floro, testified that of Holzer's nine stab wounds, six had penetrated her heart and three had penetrated her left lung. Dr. Floro indicated each of the wounds was potentially fatal. According to Dr. Floro, one wound, which he believed to be the initial wound, was consistent with having been made by someone sitting in the passenger's seat while Holzer was seated in the driver's seat and the rest of the wounds were consistent with the victim lying on her back. Dr. Floro also indicated that there were wounds and other signs that were consistent with Holzer struggling to escape or protect herself. Additionally, Dr. Floro discovered two small bruises inside the victim's vagina and he opined that they were made no more than twelve hours before Holzer's death.
Police learned that Holzer had last been seen the previous day at Buddy Boy's, a small convenience store located in St. Johns County, Florida, where she was employed. Early in the afternoon of December 29, 1997, Holzer left work to deposit money for Buddy Boy's and also to deposit money for a small meat shop that was located behind Buddy Boy's.[1] Cindy Schmermund was Holzer's friend and coworker. Both Schmermund and Holzer knew Taylor from having worked at Buddy Boy's.[2] Schmermund remembered Holzer leaving around 1 p.m. to make the deposit, which had to be to the bank by 2 p.m. The deposit included cash and checks, with the cash portion of the deposit totaling more than $6000. Schmermund saw Holzer pull up to Buddy Boy's gas pumps with Taylor in the car. After pumping the gas, Holzer entered the store, and Schmermund questioned her as to why Taylor was in her car. Schmermund testified that Holzer said she was giving Taylor a ride to Green Cove Springs to pick up a rental car and that "[Taylor] was harmless. [I'll] be fine. Don't worry about it. I'll be back in a minute." Several other individuals, Joe Dunn, Arthur Mishoe, and Nolan Metcalf, also saw Taylor accompanying Holzer as she was leaving to make the deposit and each testified that they each heard Holzer making various statements about taking Taylor to Green Cove Springs, including statements that she did not want anyone to tell her husband that she was giving Taylor a ride.
On the day Holzer's body was discovered, Taylor was arrested for an unrelated burglary involving the theft of a briefcase from a vehicle. At the time of his arrest, Taylor was wearing a pair of boxer shorts that were later discovered to have a blood stain that contained genetic material that was consistent with the Holzer's DNA profile.
At trial, the State introduced the testimony of James Bullard and Michael McJunkin, who lived with Taylor in the *11 mobile home near Buddy Boy's.[3] Both Bullard and McJunkin testified that Taylor made comments about wanting to have sex with Holzer. Bullard and McJunkin also testified that Taylor was having financial problems and had been having difficulty paying his bills. Additionally, Taylor had recently been involved in an accident with his truck. While he was waiting on the insurance payments, he was driving a rented white Geo Metro.
The State also introduced evidence showing Taylor had substantial sums of money on the day of Holzer's disappearance. Most notably, Taylor was photographed depositing $1700 into his bank account at 3:48 p.m., only a few hours after Holzer had deposited money for the meat shop. Before making the deposit, Taylor had a negative balance and had recently bounced several checks. That same afternoon, Taylor went to a restaurant and lounge to give the owner some money to cover some bad checks Taylor had written. Taylor also stopped by Garber Ford Mercury, a car dealership in Green Cove Springs, where he expressed interest in purchasing a truck.[4] Additionally, on the evening of December 29, 1997, Taylor and McJunkin went to a local bar. A bartender testified that Taylor bought a number of drinks for other bar patrons and, by the end of the evening, he had incurred a bill of approximately $150 to $200. In addition to paying for the drinks, Taylor gave the bartender two $100 bills as a tip.
By early morning on December 30, 1997, the police had interviewed the witnesses who had seen Taylor with Holzer. The police also learned Holzer had not deposited the money into Buddy Boy's account. Although they did not discover her car and body until later in the evening, police also knew that Holzer had not been to feed or tend to her horse. The police dispatcher put out information with Taylor's address and a description of his rental car.
Deputy Chris Strickland was off duty and was driving with a friend in the vicinity of Vineyard Trailer Park when he learned from the dispatch about Holzer's disappearance. Strickland proceeded to Taylor's mobile home and discovered that Taylor's rental car was parked outside.[5] Strickland called in for a marked unit, and shortly thereafter, Deputy Bob Lindsey arrived. Deputies Strickland and Lindsey knocked on the door of the mobile home and McJunkin answered the door and invited the officers inside. Taylor had been taking a shower and walked into the living room of the mobile home wearing only a towel. Deputy Strickland suggested Taylor get dressed, and watched Taylor get dressed to make sure that Taylor did not arm himself. The deputies informed Taylor that Holzer was missing and that he had been the last person seen with her. They also told him that Detective Ronnie Lester wanted to speak with him at the station.
Shortly after Strickland and Lindsey entered the trailer, Deputies John Noble and Shawn Lee arrived and entered the open door of the trailer. When the other deputies arrived, Deputy Strickland and his friend left. Deputy Lindsey was given Taylor's driver's license and he took it to *12 his patrol car to see if Taylor had any outstanding warrants. From his patrol car, Lindsey had an unobstructed view of Taylor sitting in a chair inside the mobile home. He observed Taylor reach into his pocket, remove something, and shove it under the cushion of the chair where he was sitting. Alarmed that Taylor had placed a weapon under the cushion, Lindsey went quickly into the mobile home and asked Taylor to get up and move toward the kitchen. When asked what he had concealed, Taylor denied placing anything under the cushion. Upon obtaining Taylor's permission, the deputies looked under the cushion and discovered a roll of cash, totaling around $1600. The police handcuffed Taylor, read him his rights, and took him outside to sit in the back seat of a patrol vehicle with the door open, at which point they removed the handcuffs. At Noble's request, Taylor signed two consent forms to search the mobile home and his rental car. Deputy Noble testified that Taylor told him there was more money under the passenger's seat of his car. Noble looked under the seat and observed a purple bag full of money.
McJunkin was a key witness for the State at trial. McJunkin testified that Taylor had occasionally talked about robbing Holzer. According to McJunkin, Taylor had chosen Holzer as his target because Buddy Boy's was close to the Vineyard Trailer Park and he knew when Holzer left to make deposits at the bank. On the morning of December 29, 1997, McJunkin and Taylor were staying at the house of Taylor's estranged wife, Mary Ann Taylor. McJunkin said that after Mrs. Taylor left for work, Taylor decided to rob Holzer. McJunkin drove Taylor to Buddy Boy's and dropped him off.[6] Taylor instructed McJunkin to return to Mrs. Taylor's house and wait for him to call. Later, Taylor called from a gas station in Green Cove Springs and told McJunkin to come pick him up. After picking Taylor up, McJunkin drove to a parking lot, where Taylor proceeded to count and separate large amounts of money that he had concealed in his waistband. Taylor put the money into a purple velvet bag that had contained a bottle of "Crown Royal" liquor. According to McJunkin, Taylor said that "if [Holzer] didn't show up within a couple days everything should be fine."
McJunkin testified that he and Taylor returned to the mobile home and Taylor changed his clothes and placed the clothes and shoes he had been wearing into a trash bag.[7] According to McJunkin, Taylor threw this trash bag into a dumpster behind the restaurant where he had paid for his bad checks. McJunkin testified that at some point as they drove from location to location, they crossed the Bridge of Lions in St. Augustine and as they were driving across, Taylor directed McJunkin to throw a knife off the bridge.
At trial, Taylor's defense was that McJunkin had committed the robbery and murder. Taylor took the stand in his own defense. Taylor did not deny requesting a ride or leaving Buddy Boy's with Holzer in her car. Taylor alleged that he walked to Buddy Boy's after McJunkin had taken his rental car to the mobile home, leaving *13 Taylor stranded at his wife's house. Taylor claimed that he asked Holzer to take him to his mobile home to pick up his rental car. According to Taylor's version of events, Holzer dropped him off at the mobile home and McJunkin was there playing video games. Taylor claimed Holzer gave McJunkin a ride to Green Cove Springs to visit a friend and some time later, McJunkin called him from a gas station near the scene of the crime to pick him up. During his testimony, Taylor denied telling Deputy Noble about additional money under the passenger's seat of the rental car. Taylor also explained that the money he deposited in his bank account and the money that he hid under the seat cushion in the trailer was money he had stolen from the briefcase of a man named Chip Yelton.[8]
The jury found Taylor guilty of first-degree murder and robbery with a deadly weapon. At the penalty phase, the State presented evidence of a prior violent felony Taylor had committed and Taylor introduced the testimony of a number of witnesses with regard to his troubled childhood. By a vote of ten to two, the jury recommended the death penalty, and the trial court sentenced Taylor to death. The trial court found four aggravating circumstances, two of which were merged.[9] In mitigation, the court found Taylor had proven three nonstatutory mitigating circumstances.[10] After weighing the aggravators and mitigators, the trial court determined that the aggravation "greatly outweighs the relatively insignificant nonstatutory circumstances established by this record" and sentenced Taylor to death.

ANALYSIS
Taylor raises nine issues in his appeal.[11] Notwithstanding his challenge to *14 the trial court's denial of his motion to suppress, Taylor does not otherwise challenge the sufficiency of the evidence. This Court has the obligation to independently review the record for sufficiency of the evidence. See Sexton v. State, 775 So.2d 923, 933-34 (Fla.2000); Brown v. State, 721 So.2d 274, 277 (Fla.1998) (citing § 921.141(4), Fla. Stat. (1997)). We have independently reviewed the evidence in this case and we conclude that there is sufficient evidence supporting the convictions in this case.

MOTION TO SUPPRESS
Taylor argues that the trial court erred in failing to suppress physical evidence seized from his residence and rental car, as well as the clothes he was wearing when he was arrested. Taylor also argues that the trial court erred in failing to suppress statements he made to the police on December 30, 1997. Taylor bases his arguments on the facts surrounding his initial encounter with police at his mobile home and the subsequent chain of events leading up to his arrest for the burglary of Chip Yelton's truck. Prior to trial, Taylor moved to suppress the physical evidence and his statements. After holding a hearing over two separate days, the trial court denied his motion.
Taylor's claim is broken into a number of separate subissues that roughly follow the chronology of Taylor's interactions with law enforcement officers on December 30, 1997. Namely, Taylor argues: (1) his initial encounter with police constituted an unlawful seizure; (2) the search underneath his chair cushion was illegal because the police did not have probable cause to believe Taylor was armed and dangerous; (3) after discovering the money under Taylor's chair cushion, police exceeded the permissible scope of detention, resulting in a de facto arrest without probable cause; (4) the evidence seized from Taylor's home and car was the fruit of an unlawful arrest and unlawful search; (5) Taylor's statements to law enforcement officers were the fruit of his unlawful arrest; and (6) Taylor's arrest for the burglary of Yelton's truck stemmed from his illegal arrest and unlawfully obtained confession and, hence, his clothing was illegally seized.
We have explained that there are essentially three levels of encounters an individual can have with the police:
The first level is considered a consensual encounter and involves only minimal police contact. During a consensual encounter a citizen may either voluntarily comply with a police officer's requests or choose to ignore them. Because the citizen is free to leave during a consensual *15 encounter, constitutional safeguards are not invoked. United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).
The second level of police-citizen encounters involves an investigatory stop as enunciated in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). At this level, a police officer may reasonably detain a citizen temporarily if the officer has a reasonable suspicion that a person has committed, is committing, or is about to commit a crime. § 901.151 Fla. Stat. (1991). In order not to violate a citizen's Fourth Amendment rights, an investigatory stop requires a well-founded, articulable suspicion of criminal activity. Mere suspicion is not enough to support a stop.
... [T]he third level of police-citizen encounters involves an arrest which must be supported by probable cause that a crime has been or is being committed. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); § 901.15 Fla. Stat. (1991).
Popple v. State, 626 So.2d 185, 186 (Fla. 1993) (citation omitted).
Although Taylor's dealings with the police progressed through each of these three stages, the initial contact Taylor had with the police on December 30, 1997, constituted a consensual encounter. We have recognized that "[t]he United States Supreme Court has defined a consensual encounter as one in which a reasonable person would feel free to disregard the police and go about the person's business." Voorhees v. State, 699 So.2d 602, 608 (Fla.1997). The police are not required to have a reasonable suspicion of improper conduct to initiate a consensual encounter. Id. When determining whether a particular encounter is consensual, the Court must look to the "totality of the circumstances" surrounding the encounter to decide "if the police conduct would have communicated to a reasonable person that the person was free to leave or terminate the encounter." Id.
Looking at the totality of the circumstances, we conclude that a reasonable person in Taylor's position would have felt free to leave or terminate the encounter. Only two deputies, Strickland and Lindsey, initiated the encounter at Taylor's trailer, and one of them was wearing plain clothes.[12] The deputies knocked on the door and were allowed inside by McJunkin. Neither deputy had his weapon drawn and there was no overt demonstration of police authority until Taylor hid the money under his chair.[13] The deputies informed Taylor that they were there to ask him some questions about Holzer because she was missing and several people had seen him with her. Thus, we conclude that Taylor was not in illegal custody when Deputy Lindsey observed him hiding something under his seat cushion, giving *16 the deputies the right to escalate the level of restraint and detain Taylor to make sure he was not armed.
Next, Taylor argues that the police should not have been able to search under the seat cushion, in part because they did not have probable cause to believe he was armed and dangerous. In its order denying Taylor's motion to suppress, the trial court determined that when Deputy Lindsey observed Taylor's furtive movements, the officers "had a reason to `frisk' [Taylor] or to conduct a protective sweep of the area in which [Taylor] was sitting and make sure they were in no danger." The trial court based its decision on the Supreme Court's opinion in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We have observed:
The United States Supreme Court has refused to apply a bright-line test for determining what police action is permissible in an investigatory stop. United States v. Sharpe, 470 U.S. 675, 685, 105 S.Ct. 1568, 1574, 84 L.Ed.2d 605 (1985). Rather, each case turns on its particular facts. Terry v. Ohio, 392 U.S. at 29, 88 S.Ct. at 1884. The appropriate question in each case is whether the action was reasonable under the circumstances. This requires a twofold inquirywhether the action was justified at its inception and whether it was reasonably related in scope to the circumstances which justified the interference in the first place. Id. at 19-20, 88 S.Ct. at 1878-79.
Reynolds v. State, 592 So.2d 1082, 1084 (Fla.1992).
Notably, the deputies knew, at the very least, that Taylor would have information that would assist them in their investigation of Holzer's disappearance, as he was the last person seen with her. Moreover, Taylor concedes that their initial entry was consensual. Therefore, the initial police action was a consensual encounter that was justified at its inception. Deputy Lindsey testified that when he observed Taylor making furtive movements, he believed that Taylor may have hidden a weapon and that deputies Noble and Lee, who were still inside the mobile home and had not seen Taylor's movements, were potentially in danger. Moreover, Taylor denied placing anything under the cushion, which contradicted Lindsey's personal observation. Finally, the officers asked for Taylor's permission to look under the cushion and Taylor granted his permission. Given all the facts available to Deputy Lindsey and the other officers, we conclude that looking under the chair cushion and Taylor's brief detention were not unreasonable. See Tamer v. State, 484 So.2d 583, 584 (Fla.1986) (holding that "[a]lthough none of the facts standing alone might give rise to a reasonable suspicion, taken together as viewed by an experienced police officer they provided clear justification for a brief detention"). The discovery of money under the cushion, while serving to arouse further suspicion as to Taylor's involvement in Holzer's disappearance, would not dispel the possibility that Taylor was armed or had grabbed something to arm himself from under the chair's cushion.
Next, Taylor argues that his consent to search his trailer and car were not voluntarily given because he was in illegal detention. Similarly, he claims that his statement to Deputy Noble that there was additional money in the car should have been suppressed because it was the direct product of an illegal arrest. Because we find that the police were justified in temporarily handcuffing Taylor and removing him from the mobile home, we conclude that he was not illegally detained when he gave his consent to search the trailer and *17 car or when he made his statements to Noble.
Furthermore, to the extent that Taylor's argument can be construed as an attack on his consent to the searches or the voluntary nature of his statements to Noble, we conclude that he is not entitled to relief. In Denehy v. State, 400 So.2d 1216, 1217 (Fla.1980), we held that "[u]nder ordinary circumstances the voluntariness of the consent to search must be established by preponderance of the evidence." In analyzing whether a defendant's consent to a search is voluntary, a court should consider the totality of the circumstances around the granting of consent to the search. See Norman v. State, 379 So.2d 643, 646-47 (Fla.1980). When the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given. See Reynolds, 592 So.2d at 1086. In a situation where there is neither an illegal detention nor other illegal conduct by the police, as we have concluded in the instant case, the State must establish the voluntariness of the consent by a preponderance of the evidence. See id. Here, the record reflects the State met its burden.[14] Additionally, Taylor's statement to Deputy Noble about the additional money under the passenger's seat was not the product of any illegal activity by law enforcement. Taylor's statement was spontaneously made, and Deputy Noble was not interrogating Taylor when Taylor told him that there was more money in the car. Moreover, before Taylor volunteered the information about the additional money in the car, Deputy Noble had read Taylor his Fifth Amendment rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and asked Taylor if he understood his rights. In response, Taylor "shrugged his shoulders." [15] Taylor did not indicate that he did not understand his rights and he did not invoke his right to counsel or his right to remain silent. Therefore, Taylor's statement to Deputy Noble was admissible.
Next, Taylor argues that he was under de facto arrest when he was taken to the police station and, therefore, his subsequent confession to Detective Lester about the burglary was the fruit of an illegal arrest.[16] We disagree because the facts surrounding Taylor's trip to the station do not meet the custody requirement in order for him to be considered to be under arrest. In order to conclude Taylor was in custody, "it must be evident that, under the totality of the circumstances, a reasonable person in the suspect's position would feel a restraint of his or her freedom of movement, fairly characterized, *18 so that the suspect would not feel free to leave or to terminate the encounter with police." Connor v. State, 803 So.2d 598, 605 (Fla.2001).
When he was asked to accompany Noble to the station, Taylor voluntarily agreed.[17] Moreover, although Taylor rode in the back of the police car, Noble testified at the suppression hearing that Taylor was not handcuffed during the ride. Upon arriving at the station, Noble handcuffed Taylor for safety reasons, but explained to him that he was not under arrest. Thus we conclude that Taylor's transportation to the station did not amount to an illegal detention or de facto arrest.
Moreover, Lester's questioning of Taylor, during which Taylor confessed to the burglary of Yelton's truck, likewise did not violate Taylor's rights. Lester repeated the Miranda warnings and read Taylor his rights from a waiver form, which Taylor signed. Hence, Taylor voluntarily agreed to talk with Lester and confessed to taking the money from Yelton's truck, which gave Lester probable cause to arrest Taylor for the burglary. Finally, because Taylor's arrest was not illegal, we conclude that Taylor's clothing, which later linked him to the victim, was taken in a valid inventory search incident to a lawful arrest for the burglary of Chip Yelton's truck. See State v. Forbes, 419 So.2d 782, 783 (Fla. 2d DCA 1982) ("An inventory search is a recognized exception to the requirement of a warrant as long as it is conducted in accordance with standard police procedure. Where such a search is used as a pretext to seize evidence illegally, that evidence will be suppressed."). Taylor's clothing was taken as part of the normal booking procedures, and therefore we conclude that the trial court did not err in denying Taylor's motion to suppress.

HEARSAY STATEMENTS
Next, Taylor claims that testimony from Joe Dunn, Arthur Mishoe, Alex Metcalf, and Cynthia Schmermund regarding Holzer's statements was inadmissible hearsay. The trial court allowed the statements to come into evidence under the "state of mind" exception discussed in Peede v. State, 474 So.2d 808, 816 (Fla.1985) (holding that a murder victim's hearsay statements can be admitted where the victim's state of mind is a material element of the crime).
A victim-declarant's hearsay statements may not be used to prove the state of mind or motive of the defendant. See Woods v. State, 733 So.2d 980, 987 (Fla.1999); Hodges v. State, 595 So.2d 929, 931-32 (Fla.1992); Downs v. State, 574 So.2d 1095, 1098 (Fla.1991). Moreover, "a homicide victim's state of mind prior to the fatal event generally is neither at issue nor probative of any material issue raised in the murder prosecution." Woods, 733 So.2d at 987. However, there are several exceptions to the general rule that a homicide victim's hearsay statements are inadmissible. See Brooks v. State, 787 So.2d 765, 771 (Fla.2001). First, a victim's state of mind is at issue when it goes to a material element of the crime. See Peede v. State, 474 So.2d 808 (Fla.1985) (holding that victim's state of mind was relevant as an element of kidnapping to show that she was forcibly abducted against her will); see also Pacifico v. State, 642 So.2d 1178, 1185 (Fla. 1st DCA 1994) (holding that state of mind of victim was at issue to *19 show she did not consent to sexual intercourse in trial for sexual battery). Second, "the victim's state of mind may become relevant to an issue in the case where the defendant claims: (1) self-defense; (2) that the victim committed suicide; or (3) that the death was accidental." Stoll v. State, 762 So.2d 870, 874-75 (Fla.2000). Third, a homicide victim's state of mind "may become an issue to rebut a defense raised by the defendant." Id. at 875 (citing State v. Bradford, 658 So.2d 572, 574-575 (Fla. 5th DCA 1995)). Even if one of these exceptions applies or the victim's state of mind is relevant under the particular facts of the case, the prejudice inherent in developing such evidence frequently outweighs the need for its introduction. See Fleming v. State, 457 So.2d 499, 501 (Fla. 2d DCA 1984).
In the instant case none of the exceptions we have previously recognized for admitting a victim's hearsay statements are applicable.[18] The trial court admitted the hearsay statements as a material element of the crime based on our decision in Peede. However, in Peede, we held that a victim's statements concerning her reluctance about meeting the defendant at the airport went to a material element of the crime of kidnapping to show that the victim was abducted against her will. See Peede, 474 So.2d at 816.[19] In the instant case, the victim's statements did not go to a material element of the crime. The State argues that in addition to the underlying felony of robbery, felony murder charges are also supported by the underlying felony of kidnapping because it is clear that Holzer would not have ended up in the woods voluntarily. However, Taylor did not argue that Holzer voluntarily went with him into the woods when she was killed or that she went voluntarily with her killer. Furthermore, Holzer's statements to the witnesses were markedly different than the type of statements the victim made in Peede. In Peede, the victim's statements were highly relevant in demonstrating that her "state of mind" was that she specifically did not want to leave the Miami area with the defendant and that she was afraid of what the defendant might do when she picked him up from the airport. By contrast, Holzer's statements do not provide the same level of insight or relevance into her "state of mind" regarding whether she was taken into the woods against her will. Therefore, we agree with Taylor that the trial court should not have let the statements in under the Peede exception.
Even though the introduction of the statements under the exception noted in Peede was improper, the trial court's evidentiary decision can be affirmed if another theory supports admission of the statement. See Caso v. State, 524 So.2d 422, 424 (Fla.1988) ("A conclusion or decision of a trial court will generally be affirmed, even when based on erroneous reasoning, if the evidence or an alternative theory supports it."). The State argues that the hearsay exception in section 90.803(3)(a)2, Florida Statutes (1999), provides a basis *20 for introducing the hearsay statements because the statements go to prove or explain subsequent acts by the declarant.
Although Holzer's statement to Schmermund that "Taylor was harmless" and her statements asking others not to tell her husband that she was giving Taylor a ride would not fit under this exception, some of Holzer's other statements might provide limited support explaining her subsequent conduct of letting Taylor into her car and driving away from Buddy Boy's in the direction of Green Cove Springs. However, it is clear that the State's interest in admitting the statements was not to prove her subsequent acts. Rather, the purpose in introducing the statements was to prove that Taylor had requested a ride all the way to Green Cove Springs, providing support for the State's theory that Taylor was the one who was in the car when she was murdered. In Brooks, we determined that the trial court had erred in allowing a homicide victim's hearsay statements to be admitted to show that the defendant had driven to the location where the victim was found murdered. See Brooks, 787 So.2d at 771.[20] Similarly, in the instant case, some of Holzer's statements indicated that Taylor had requested a ride all the way to Green Cove Springs. Thus, Holzer's statements could be probative of Taylor's state of mind, i.e., that he intended to ride with Holzer all the way to Green Cove Springs. See Woods, 733 So.2d at 987 (noting that out-of-court statements by the declarant, who was victim in the case, could not be used to prove the state of mind or motive of the defendant); see also Stoll, 762 So.2d at 875 (rejecting State's argument that hearsay statements should have been let in to rebut defendant's contention that someone else committed the murder because it did not fit within one of the narrow exceptions we have recognized for admitting a homicide victim's hearsay statements).[21]
Because there is no valid hearsay exception for admitting Holzer's statements, the trial court erred in allowing testimony about her statements. Nevertheless, we conclude that the admission of Holzer's statements was harmless. All of the witnesses in question testified that they saw Taylor getting into the passenger's seat and driving away with Holzer. Additionally, the jurors knew that Holzer had a large amount of money with her when she left and that she was going to the banks in Green Cove Springs. Holzer's hearsay statements were of little consequence given the more important witness testimony that Holzer and Taylor drove away together and subsequently no one saw the victim alive again. Therefore, we find the error was harmless because there is no reasonable possibility that the *21 admission of the statements contributed to the guilty verdict. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986); see also Woods, 733 So.2d at 988 (holding that erroneous admission of victim's hearsay statements was harmless).

"BAD ACT" EVIDENCE
Taylor argues that the trial court erred in admitting into evidence a credit application that Taylor had filled out at the Garber Ford Mercury car dealership, which contained several false representations by Taylor.[22] When the State sought to introduce the application, Taylor objected on the basis that the application was irrelevant and could be construed as an attack on character based on the false statements. The trial court examined the application, overruled Taylor's objection, and entered the application into evidence.
Under section 90.402, Florida Statutes (1999), "[a]ll relevant evidence is admissible, except as provided by law." Relevant evidence is evidence that tends "to prove or disprove a material fact." § 90.401, Fla. Stat. (1999). There is a distinction between the admission of similar bad acts and "other" bad acts that are not similar to the offense charged. Regarding the admissibility of "other crimes" or bad acts, we have stated:
Evidence of "other crimes" is not limited to other crimes with similar facts. So-called similar fact crimes are merely a special application of the general rule that all relevant evidence is admissible unless specifically excluded by a rule of evidence. The requirement that similar fact crimes contain similar facts to the charged crime is based on the requirement to show relevancy. This does not bar the introduction of evidence of other crimes which are factually dissimilar to the charged crime if the evidence of other crimes is relevant.
Bryan v. State, 533 So.2d 744, 746 (Fla. 1988); see also Sexton v. State, 697 So.2d 833, 837 (Fla.1997) (stating "if evidence of a defendant's collateral bad acts bears no logical resemblance to the crime for which the defendant is being tried, then section 90.402(2)(a) does not apply and the general rule in section 90.402 controls"); Pittman v. State, 646 So.2d 167, 170 (Fla.1994) ("[E]vidence of bad acts or crimes is admissible without regard to whether it is similar fact evidence if it is relevant to establish a material issue."). Moreover, "[a] trial court has broad discretion in determining the relevance of evidence and such a determination will not be disturbed absent an abuse of discretion." Sexton, 697 So.2d at 837; see also Randolph v. State, 463 So.2d 186, 189 (Fla.1984) (stating that "[e]ven if the evidence in question tends to reveal the commission of a collateral crime, it is admissible if found to be relevant for any purpose save that of showing bad character or propensity").
In the instant case, Taylor's collateral bad act involved lying on the credit application. Taylor was not being tried for fraudulently trying to obtain credit, or some similar crime, and thus general relevancy rules would control the admissibility of the credit application. See §§ 90.401-90.402, Fla. Stat. (1999). However, relevancy is not the only test for admissibility. Sexton, 697 So.2d at 837. Despite the fact that all relevant evidence is admissible, section 90.403 provides for the exclusion of relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion *22 of issues, misleading the jury, or needless presentation of cumulative evidence." § 90.403, Fla. Stat. (1999). Although section 90.403 mandates the exclusion of unfairly prejudicial evidence, a large measure of discretion rests in the trial judge to determine whether the probative value of the evidence is substantially outweighed by its prejudicial effect. See Walker v. State, 707 So.2d 300, 309 (Fla. 1997). This discretion must be exercised in accord with controlling legal principles:
In weighing the probative value against the unfair prejudice, it is proper for the court to consider the need for the evidence; the tendency of the evidence to suggest an improper basis to the jury for resolving the matter, e.g., an emotional basis; the chain of inference necessary to establish the material fact; and the effectiveness of a limiting instruction.
State v. McClain, 525 So.2d 420, 422 (Fla. 1988) (quoting Charles W. Ehrhardt, Florida Evidence § 403.1, at 100-03 (2d ed.1984)).
Although the credit application may have had limited relevancy to show that Taylor was shopping for an expensive item and would need money to pay for it since he was unemployed, its probative value as to whether Taylor committed the robbery and murder was low.[23] Considering the criteria set out above, we conclude that the trial court erred in admitting the credit application. However, given the minor role the evidence played in the State's case and the fact that the false statements on the application were never mentioned to the jury, we conclude that this error was harmless beyond a reasonable doubt.

BOLSTERING OF WITNESS TESTIMONY
Next, Taylor argues that the trial court erred in allowing the State to introduce Deputy Noble's prior consistent statement from his previous testimony at the hearing on Taylor's motion to suppress. The State utilized Noble's prior consistent statement to support his trial testimony that Taylor told him there was additional money under the passenger's seat of the rental car.[24]
Generally, prior consistent statements are inadmissible to corroborate or bolster a witness's trial testimony. See, e.g., Bradley v. State, 787 So.2d 732, 743 (Fla.2001); Chandler v. State, 702 So.2d 186, 197 (Fla.1997); Jackson v. State, 498 So.2d 906, 910 (Fla.1986); Van Gallon v. State, 50 So.2d 882 (Fla.1951). Because they are usually hearsay, "[i]n order to be admissible, prior consistent statements, *23 like any other hearsay statements, must qualify under a hearsay exception." See Bradley, 787 So.2d at 743. However, prior consistent statements can be admitted as non-hearsay "if the following conditions are met: the person who made the prior consistent statement testifies at trial and is subject to cross-examination concerning that statement; and the statement is offered to `rebut an express or implied charge ... of improper influence, motive, or recent fabrication.'" See Chandler, 702 So.2d at 197-98 (quoting Rodriguez v. State, 609 So.2d 493, 500 (Fla.1992)); see also § 90.801(2)(b), Fla. Stat. (1999). However, a witness's prior consistent statements used for rehabilitation must have been made before the existence of a fact said to indicate bias, interest, corruption, or other motive to falsify the prior consistent statement. See Jackson, 498 So.2d at 910; see also Quiles v. State, 523 So.2d 1261, 1263 (Fla. 2d DCA 1988).
The first condition of Chandler is met because Deputy Noble testified at trial and Taylor was given the opportunity to cross-examine Noble regarding his prior consistent statements. Thus, this issue turns on whether the second condition of Chandler is met, as well as whether the timing requirement in Jackson is satisfied, i.e., (1) whether Noble's statements were introduced to rebut an express or implied charge against the witness of improper influence, motive, or recent fabrication, and (2) if so, whether Noble's prior consistent statement was made before the existence of a fact said to indicate bias, interest, corruption, or other motive to falsify the prior consistent statement.
Defense counsel's questioning of Noble did not expressly charge him with an improper influence, motive, or recent fabrication. Moreover, it is questionable that defense counsel's questions raised an implicit charge. Rather, the questioning dealt with the proper preparation of police reports and the observation that Noble's written report did not contain Taylor's statement.[25] In a similar situation, we found it questionable whether defense counsel's cross-examination of a police detective insinuated that he had recently fabricated his testimony:
The trial court allowed Detective Steve Leary to testify about a statement made to him by Detective Redmond regarding whether Bradley had gotten his car cleaned prior to the car being seized and processed for blood evidence. Specifically, Detective Leary testified that Detective Redmond told him that Bradley's van had been detailed prior to the seizure of the van by the police. The trial court allowed the testimony as a prior consistent statement of Detective Waugh that Bradley had told him on a January 22 taped interview that he had detailed his van four or five times since the time of the killing.
We conclude that the trial court erred in allowing this testimony. At the outset, it is questionable whether defense counsel's cross-examination of Detective Waugh was an insinuation of recent fabrication. He merely asked the detective why Bradley's statement relating to the van being detailed was not on the tape like the rest of the interview. At no point did he charge the detective with having recently fabricated the story about the detailing of the van.
Bradley, 787 So.2d at 743. Although the prior consistent statement that was introduced in Bradley was made by an officer *24 who did not testify at trial, we noted that defense counsel's cross-examination of the detective about why a defendant's statement was not in a taped interview was not the equivalent of accusing the detective of having recently fabricated a story that implicated the defendant. See id. Likewise, Taylor's counsel did not expressly or implicitly charge Noble with recently fabricating his story. Taylor's questioning revealed that Deputy Noble's report detailed other aspects of the encounter with Taylor, but did not mention the fact that Taylor told him that there was additional money in the car. Thus, the admission of Noble's 1999 statement under the theory that it rebutted an allegation of a recent fabrication instead served to improperly bolster Noble's credibility regarding his trial testimony. Hence, the introduction of Noble's prior consistent statement was in error.
Nevertheless, we find that this error was harmless. In his brief, Taylor argues that his impeachment implied "that Noble fabricated the statement after he wrote his report" and that Noble's "motive to fabricate could have arisen at any time after he wrote his report." Aside from the simple assertion that Noble had some type of motive to fabricate his testimony, Taylor does not elaborate on what motive would have caused Noble to falsely testify in court while he was under oath.[26] Furthermore, even if there was evidence of a limited motive, Taylor had the chance to cross-examine Deputy Noble both at the January 1999 hearing and at trial. In fact, after Taylor's objection was overruled, Taylor used Deputy Noble's prior testimony on re-cross to further question him as to why he did not include Taylor's statement in his initial report.
Furthermore, Taylor does not challenge the fact that Noble found the money in a Crown Royal bag under the passenger's seat. Moreover, this is not a case where one witness's testimony was corroborated by another individual's prior consistent statement. In effect, Noble's prior testimony was being used to corroborate his own trial testimony, both of which were given under oath. Although prior consistent statements of the same witness should generally not be used to bolster that witness's testimony, in the instant case the effect of introducing Noble's prior consistent statement was negligible. If the jury had questions as to Noble's credibility and testimony at trial or found him credible, it is unlikely his testimony at an earlier stage *25 of the trial would have had any impact on the jury's determination. Therefore, to the extent that the trial court erred in admitting Noble's prior consistent statements, we find that the error was harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986); see also Bradley, 787 So.2d at 744-45 (finding improper admission of prior consistent statements was harmless); Chandler, 702 So.2d at 198-99 (same as Bradley ); Anderson v. State, 574 So.2d 87, 93 (Fla.1991) (noting that the improper admission of prior consistent statements is subject to harmless error analysis).

EVIDENCE TAMPERING
Taylor argues that the trial court erred in admitting a pair of boxer shorts that had a blood stain containing genetic material that was consistent with the victim.[27] At trial, Taylor's counsel objected to their introduction claiming that the bag that the boxer shorts had been kept in showed signs of tampering, and that the State had not shown a proper chain of custody. After hearing arguments outside the presence of the jury and carefully examining a stapled seal on the bag, the trial court found no showing of tampering.
Relevant physical evidence can be admitted "unless there is an indication of probable tampering." Murray v. State, 838 So.2d 1073, 1082 (Fla.2002); Peek v. State, 395 So.2d 492, 495 (Fla.1980); see also Terry v. State, 668 So.2d 954, 959 n. 4 (Fla.1996). Once a party produces evidence of tampering, "the proponent of the evidence is required to establish a proper chain of custody or submit other evidence that tampering did not occur." Taplis v. State, 703 So.2d 453, 454 (Fla.1997).
Taylor claims that the boxer shorts should have been excluded because the bag in which they were kept had been tampered with or altered, as evidenced by a missing note and a loose staple on the seal of the bag.[28] While Taylor may have been able to show differences in the outside condition of the bag, it is not clear that the changes in question gave rise to an indication of probable tampering. Taylor's argument that some unidentified individual had tampered with the bag required a factual determination, and the trial court was in the best position to assess the condition of the stapled seal at trial. At trial, the court examined the bag, in particular the stapled seal, and specifically found that Taylor had not shown any tampering with the bag. Furthermore, although the bag was not picked up by the FDLE for two weeks, it was stored during this time in a locked cabinet and only the booking officers had access to the cabinet. Hence, we find that the trial court did not abuse its discretion in admitting Taylor's boxer shorts without requiring the State to "establish a proper chain of custody or submit *26 other evidence that tampering did not occur." See Taplis, 703 So.2d at 454.

MARITAL PRIVILEGE
Taylor argues that the marital privilege was violated when the trial court required Taylor's wife to testify about specific statements made by Taylor. Before trial, Taylor had filed a motion in limine invoking the marital privilege regarding statements he made to his estranged wife, Mary Ann Taylor. Taylor called Mrs. Taylor to testify and during direct examination she testified that she bought McJunkin a bus ticket so that he could return to Arkansas. During cross-examination, Mrs. Taylor testified that Taylor said McJunkin would need money to pay for the ticket. The defense objected to this testimony based on Taylor's pretrial motion in limine. The trial court overruled the objection, and allowed the State to ask: (1) when Mrs. Taylor talked to Taylor, and (2) if Taylor told her that McJunkin needed money to get back to Arkansas. The trial court based its ruling on the State's assertion that the "door had been opened" for those two questions. On appeal, Taylor argues that this testimony was introduced in violation of the marital privilege and that it was harmful because it would have conflicted with Taylor's contention that McJunkin had committed the robbery and therefore would not have needed money for a bus ticket.
Florida's marital privilege applies only to communications and is codified in section 90.504, Florida Statutes (1999), which provides in relevant part:
(1) A spouse has a privilege during and after the marital relationship to refuse to disclose, and to prevent another from disclosing, communications which were intended to be made in confidence between the spouses while they were husband and wife.
(2) The privilege may be claimed by either spouse....
Even if the marital privilege exists, there are limitations on the privilege, and in certain situations the privilege may be waived. See, e.g., § 90.507, Fla. Stat. (1999).
In the instant case, no privileged material was revealed until the State asked Mrs. Taylor how she knew that McJunkin did not have enough money and she responded that "maybe" Taylor had told her. The State then proceeded to ask about the privileged conversation leading to the question, "And he told you that Michael needed money to get back to Arkansas?" to which Mrs. Taylor responded "Yes." At this point, Mrs. Taylor had answered the State's question, and therefore there was no way to prevent the privileged material from being revealed. See Kerlin v. State, 352 So.2d 45, 52 (Fla.1977) ("Waiver occurs by failure to assert the privilege by objection or a voluntary revelation by the holder of the communication, or a material part thereof."); see also Hamilton v. Hamilton Steel Corp., 409 So.2d 1111, 1114 (Fla. 4th DCA 1982) ("[O]nce the privilege is waived, and the horse out of the barn, it cannot be reinvoked."). However, defense counsel's subsequent objection revoked any implicit waiver regarding further testimony about privileged matters.[29] Thus, the court *27 erred in requiring Mrs. Taylor to continue answering questions with regard to privileged material. First, it was the State's questioning that "opened the door" and elicited the privileged information. Second, Taylor's counsel immediately interrupted the proceedings after Mrs. Taylor's brief answer, which prompted the judge to send the jury out, and the parties presented arguments before the trial court overruled Taylor's objection. See Evans v. State, 800 So.2d 182, 188 (Fla.2001) (stating that even where a witness is able to answer a question before objection, "an objection need not always be made at the moment an examination enters impermissible areas of inquiry"); Jackson v. State, 451 So.2d 458, 461 (Fla.1984). But see Woodel v. State, 804 So.2d 316, 323 (Fla. 2001) (finding that defendant waived marital privilege by waiting two days after prosecutor commented on the marital privilege before moving for mistrial). Third, if the trial court had sustained Taylor's objection, the court could have instructed the jury to disregard Mrs. Taylor's testimony as to the privileged conversation. See Jackson, 451 So.2d at 461. And, finally, even if a limited waiver of the privilege occurred, Taylor's objection would have revoked the waiver. See Bolin v. State, 793 So.2d 894, 898 (Fla.2001) (holding that waiver of marital privilege can be revoked, but recognizing that information revealed after a privilege is waived cannot be concealed by reinvoking the privilege).[30] Therefore, we hold that the trial court erred in overruling Taylor's objection and allowing Mrs. Taylor to testify that Taylor told her that McJunkin did not have any money. Still, for the following reasons, we find that the error was harmless.
While this Court has found "marital privilege" errors to be harmful in certain cases, these cases usually involved a defendant's confessions to the crime, as well as extensive trial testimony from the spouse regarding privileged communications. For example, in Bolin v. State, 650 So.2d 21 (Fla.1995), we found reversible error where a defendant's ex-wife was allowed to testify at length about conversations in which the defendant allegedly admitted committing murder. In deciding that the error was reversible, we specifically stated:
We cannot say that these marital communications, in which Bolin admitted to committing the murder, did not contribute to the jury's determination of guilt. Thus, we cannot conclude that the admission of the privileged communications was harmless error. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
Bolin, 650 So.2d at 23 (citation omitted); see also Koon v. State, 463 So.2d 201, 203-04 (Fla.1985) (holding that trial court committed *28 reversible error where the defendant's spouse testified with respect to several conversations that she had with the defendant where he allegedly admitted to murdering the victim).
Although the trial court erred in compelling Mrs. Taylor to testify about privileged communications, under the facts present in the instant case, we conclude Mrs. Taylor's limited testimony could not have reasonably contributed to the jury's determination of guilt. Unlike that in Bolin and Koon, the testimony in the instant case about the privileged communications was extremely brief and the communications did not involve any admission, confession, or particular details about Taylor's crime. Taylor argues that the testimony would tend to show that Taylor knew that McJunkin did not have any money, which would undermine Taylor's argument that McJunkin had committed the robbery and murder. However, in addition to the privileged communications, there was other evidence that undermined his argument. Earlier in the trial, McJunkin testified he did not have enough money to purchase a bus ticket and that Mrs. Taylor "had to give me a little money." Furthermore, before the privileged communications became an issue, Mrs. Taylor had already testified that she had paid for McJunkin's ticket because she knew that he did not have enough money. Also, Mrs. Taylor answered two questions indicating that her husband told her that McJunkin did not have much money before the defense objected. Finally, there had been significant testimony from a number of witnesses that Taylor was the person spending large amounts of money shortly after the murder, not McJunkin. Therefore, any error in requiring Mrs. Taylor's testimony as to privileged matters was harmless beyond a reasonable doubt. DiGuilio, 491 So.2d at 1139.

UNDER SENTENCE OF IMPRISONMENT AGGRAVATOR
Next, Taylor argues that the trial court erred in instructing the jury on and in finding the "under sentence of imprisonment" aggravating circumstance. During the penalty phase, George Brewer, a classification administrator for the Arkansas Department of Corrections, testified that Taylor had not served any time on a twenty-year sentence for a burglary and should have been in the custody of the Arkansas Department of Corrections at the time of the murder. Brewer testified that even under Arkansas's "good time" policies, Taylor would not have been eligible for parole for at least seven and a half years and thus would still have been under sentence of imprisonment when the murder was committed. Brewer also indicated that it was through no fault of Taylor that the sentence had gone unserved and that Taylor had not been incarcerated at the time of the murder because of administrative errors.
The "under sentence of imprisonment" aggravating circumstance exists when "[t]he capital felony was committed by a person previously convicted of a felony and under sentence of imprisonment or placed on community control or on felony probation." § 921.141(5)(a), Fla. Stat. (1999). This aggravator also applies to parolees, mandatory conditional releasees, and control releasees. See Davis v. State, 698 So.2d 1182, 1193 (Fla.1997) (control releasees); Haliburton v. State, 561 So.2d 248, 252 (Fla.1990) (mandatory conditional releasees); Straight v. State, 397 So.2d 903, 910 (Fla.1981) (parolees).
Previously, we have found that this aggravating circumstance applied to a defendant who should have been incarcerated at the time he committed murder. *29 See Gunsby v. State, 574 So.2d 1085, 1090 (Fla.1991) (holding "under sentence of imprisonment" aggravator applied where defendant had been sentenced to incarceration but had not reported to jail as ordered, and a warrant had been issued for his arrest). Similarly, in the instant case, Taylor should have been serving his sentence in Arkansas when the murder occurred. Although there is a culpability distinction between Taylor, who was not serving his sentence because of an administrative mistake, and the defendant in Gunsby, who willingly did not show up to begin serving his sentence, the plain language of the statute does not make such a distinction or require any knowledge on the part of the defendant that he or she is "under sentence of imprisonment." Because Taylor should have been serving his sentence when he committed the murder and was "under sentence" according to the witness from Arkansas Department of Corrections, we find that the trial court did not err in finding this aggravating circumstance.

MITIGATING CIRCUMSTANCES
Next, Taylor challenges the trial court's rejection of five nonstatutory mitigating circumstances. Specifically, the trial court rejected the mitigating circumstances that: (1) as a child and adult, Taylor has been known to be a thief, but he has not been known as a violent person, and an act of violence is out of character for him; (2) Taylor makes friends easily, enjoys people who also enjoy him, and has done good deeds for friends and even perfect strangers; (3) Taylor enjoys family relationships and activities; (4) Taylor appears to perform well when he has structure in his life; and (5) Taylor has been and can continue to be a positive influence in the lives of family members.
A trial court in its written order must evaluate each mitigating circumstance offered by the defendant and decide if it has been established and, in the case of a nonstatutory mitigating circumstance, if it is of a truly mitigating nature. See Campbell v. State, 571 So.2d 415, 419 (Fla. 1990). A trial court "must find as a mitigating circumstance each proposed factor that is mitigating in nature and has been reasonably established by the greater weight of the evidence." Id. (footnote omitted). However, a trial court may reject a claim that a mitigating circumstance has been proven provided that the record contains competent, substantial evidence to support the rejection. See Mansfield v. State, 758 So.2d 636, 646 (Fla.2000); Ferrell v. State, 653 So.2d 367, 371 (Fla.1995). Whether a particular mitigating circumstance exists and the weight to be given to that mitigating circumstance are matters within the discretion of the sentencing court. Campbell, 571 So.2d at 420. Furthermore, the trial court's conclusions as to the weight of mitigating circumstances will be sustained by this Court if the conclusions are supported by sufficient evidence in the record. Id. In Trease v. State, 768 So.2d 1050, 1055 (Fla.2000), this Court receded from Campbell to the extent that it disallowed trial courts from according no weight to a mitigating factor and held that trial courts, for reasons unique to a case, can decide not to accord weight to a mitigating circumstance that is supported by the record. Even though a mitigating circumstance is afforded no weight, it must be expressly considered in the sentencing order. See Rogers v. State, 783 So.2d 980, 995 (Fla.2001).
In the instant case, the State claims that the mitigators in question were rejected in the weighing sense as permitted in Trease, meaning that they were not entitled to any weight, and not in the *30 evidentiary sense. However, the trial court's sentencing order specifically stated that the mitigating factors were rejected as unproven and therefore, it appears that the rejection of the five nonstatutory mitigating circumstances stemmed from the trial court's belief that the evidence did not support the circumstances.[31] Thus, we examine the trial court's decisions for an abuse of discretion, and to see if the record contains evidence to support the rejection. Here, it is clear that the trial court examined the evidence supporting the mitigating circumstances, because the evidence that would tend to support finding the circumstance is listed in the trial court's order. Nonetheless, for this Court to meaningfully review a trial court's mitigation decisions, the trial court's sentencing order should expressly evaluate whether the mitigating circumstance is supported by the evidence and whether, in the case of nonstatutory mitigating factors, it is truly of a mitigating nature. See Campbell, 571 So.2d at 419.
We agree with the State's contention that the trial court may have decided to reject Taylor's proposed mitigation that he was nonviolent based on his previous armed robbery. Although Taylor introduced testimony of family and friends that he was a nonviolent person, the trial judge was free to weigh the testimony of the individuals and still reject the mitigating circumstance. See Sireci v. State, 587 So.2d 450, 453-54 (Fla.1991) (stating that when presented with conflicting testimony, trial judge could properly conclude that mitigating circumstances had not been proven). Additionally, there is a question as to whether Taylor's claim that "he was a thief, albeit a non-violent one" is truly mitigating.
The other rejected mitigation tended to show that Taylor had some redeeming qualities. In particular, Taylor introduced some evidence that supported his claim that he made friends easily, enjoyed people, and had on occasion done good deeds for friends and even perfect strangers. The trial court's sentencing order lists the evidence that Taylor introduced in support of the proposed mitigator and concludes that "[t]his non-mitigating factor has not been proven and thus will not be considered by this Court." Although it would have been preferable for the court to give its precise reasons for rejecting the mitigation (i.e. whether the court considered the proposed mitigation nonmitigating or whether it was mitigating in some cases, but was being rejected in the instant case because it was not proven), even if the trial judge erred in rejecting this factor as nonmitigating or in failing to assign it any weight, any error would be harmless, given the minimal amount of mitigation this factor would have provided.
Similarly, even though a defendant's ability to perform well in society when provided structure in his or her life may be mitigating, the trial court may have based its decision rejecting the circumstance on the evidence in the record that showed Taylor had been convicted of twenty-two felonies and spent a large portion of his life in prison. Taylor's ability to perform well in society is undermined by the evidence of his frequent incarceration and repeated tendency to make poor choices. Furthermore, to the extent Taylor performed well within the prison system *31 structure, the trial court found mitigation in the factor that "Taylor has shown that he can be skilled, reliable and a diligent worker inside and outside of prison," which incorporated the same type of evidence that Taylor argued to support the factor that he "performs well when his life is structured."
Finally, there was also evidence in the record that would support the trial court's decision to reject the mitigating factor that "Taylor has been and can continue to be a positive influence in the lives of family members." Taylor's stepmother, wife, two of his nieces, and his nephew each testified that Taylor had helped them in the past and played an important role in their lives, and that they each wanted him to remain in their lives, even if he was incarcerated for the rest of his life. However, Taylor had been convicted of multiple felonies in addition to his conviction for murder, and most of his family members who testified do not live in Florida. Under these circumstances, it is questionable how positive a role model or influence Taylor could be to his young family members, given the fact that he is a repeat felon and has been given a death sentence for first-degree murder.
Therefore, because the trial court's order reflects that the evidence supporting this mitigation was considered, we find that the trial court's decision rejecting these five nonstatutory mitigating factors was not an abuse of discretion. See James v. State, 695 So.2d 1229, 1237 (Fla.1997) (finding that so long as the trial court considers all of the evidence, the trial court's subsequent determination of a lack of mitigating evidence will stand "absent a palpable abuse of discretion").[32]

PROPORTIONALITY
Taylor argues his death sentence is disproportionate. Due to the uniqueness and finality of death, this Court addresses the propriety of all death sentences in a proportionality review. See Porter v. State, 564 So.2d 1060, 1064 (Fla. 1990). In conducting this review, this Court considers the totality of the circumstances in a case as compared to other cases in which the death penalty has been imposed, thereby providing for uniformity in the application of the death penalty. See Urbin v. State, 714 So.2d 411, 416-17 (Fla.1998); Porter v. State, 564 So.2d at 1064. This Court's function in a proportionality review is not to reweigh the mitigating factors against the aggravating factors; that is the function of the trial court. See Bates v. State, 750 So.2d 6, 14-15 (Fla.1999). The death penalty is reserved for only the most aggravated and the least mitigated of first-degree murders. See Urbin, 714 So.2d at 416.
We find that the death penalty is not disproportionate in this case when compared with other similar cases this Court has reviewed. See, e.g., Bryant v. State, 785 So.2d 422, 437 (Fla.2001) (holding death sentence in armed robbery and murder was proportional where three aggravators outweighed one nonstatutory mitigator); Pope v. State, 679 So.2d 710, 716 (Fla.1996) (holding death sentence was proportional in murder and robbery where two aggravators, pecuniary gain and prior violent felony, outweighed two statutory mitigating circumstances and several nonstatutory mitigating circumstances); Melton v. State, 638 So.2d 927, 930 (Fla.1994) *32 (holding death penalty proportional where two aggravating factors of murder committed for pecuniary gain and prior violent felony outweighed some nonstatutory mitigation).[33]
The facts surrounding Holzer's murder were particularly egregious.[34] Aside from evidence about his childhood, the rest of the nonstatutory mitigators were relatively weak. Finally, the jury voted ten to two in favor of the death sentence. Because of the totality of the circumstances in this case considered in light of this Court's prior decisions in other capital cases involving similar circumstances, we find that Taylor's death sentence is a proportionate penalty in this case.

CONCLUSION
Based on the foregoing, we affirm appellant's convictions and sentence of death.
It is so ordered.
PARIENTE, J., and SHAW, Senior Justice, concur.
ANSTEAD, C.J., concurs specially with an opinion.
LEWIS, J., concurs in result as to the conviction, and concurs as to the sentence.
WELLS, J., concurs in result only with an opinion.
QUINCE, J., dissents.
ANSTEAD, C.J., specially concurring.
I concur in the majority opinion in all respects except for its discussion of the defendant's Apprendi claim.
WELLS, J., concurring in result only.
I concur in the result of the majority in affirming the conviction and sentence. I do not join the opinion.
*33 I find that the majority's opinion is in error as to its discussion of the hearsay statements. The majority fails to recognize that the statements under review were not hearsay. Section 90.801(1)(c), Florida Statutes, defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted."
In Breedlove v. State, 413 So.2d 1, 6 (Fla.1982), this Court made a point which is here applicable:
"Out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted." Anderson v. United States, 417 U.S. 211, 219, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974). Merely because a statement is not admissible for one purpose does not mean it is inadmissible for another purpose. Hunt v. Seaboard Coast Line Railroad Co., 327 So.2d 193 (Fla.1976); Williams v. State, 338 So.2d 251 (Fla. 3d DCA 1976). The hearsay objection is unavailing when the inquiry is not directed to the truth of the words spoken, but, rather, to whether they were in fact spoken. Id.

See also State v. Baird, 572 So.2d 904 (Fla.1991).
The statements attributed by these witnesses to victim Holzer were not offered to prove the truth of the matters contained within the statements. Rather, the fact that the victim made the statements was relevant to the issues in this case.
Likewise, I do not find that the trial court erred in respect to the exercise of discretion in admitting the credit application into evidence. Nor do I find error in admitting Deputy Noble's prior consistent statements.
NOTES
[1] As part of her duties, Holzer would periodically take the money that was received for purchases at Buddy Boy's and deposit it in Buddy Boy's account at the Barnett Bank in Green Cove Springs, Florida. As a favor, she would occasionally make a deposit for the owner of the meat shop who banked at the First Union National Bank in Green Cove Springs, Florida. Bank records showed that Holzer deposited the money for the small meat shop at First Union National Bank in Green Cove Springs at 1:22 p.m. However, the second, larger deposit for Buddy Boy's was never made.
[2] Buddy Boy's was located near Vineyard Trailer Park, where Taylor was living in a mobile home. Taylor frequently ate at a small restaurant located inside Buddy Boy's and the employees knew and recognized Taylor from his visits.
[3] At the time of the murder, McJunkin thought Taylor was his father, but later DNA testing showed that McJunkin was not Taylor's biological son.
[4] On a previous occasion, Taylor had been to the dealership and filled out paperwork pursuant to financing the purchase of a truck.
[5] Police had been by the trailer earlier in the day, but Taylor and McJunkin were at Wal-Mart, where Taylor had purchased a new pair of shoes, and a shopping mall. McJunkin testified that Taylor gave him $200 while they were out shopping.
[6] Two witnesses, Arthur Mishoe and his sister Heather Mishoe, saw an individual fitting McJunkin's description sitting in a white car near Buddy Boy's shortly before Holzer left to make the deposit.
[7] McJunkin testified that he was with Taylor when he went to the restaurant, car dealership, and the bank where Taylor deposited the $1,700. McJunkin was unsure of the exact chronology of events on the day of the murder. He was able to testify as to the locations he and Taylor traveled to, but he was not sure in which order they went to the various locations.
[8] It was Taylor's confession to this burglary that resulted in his arrest on December 30, 1997. During the defense case, Yelton testified that his briefcase had been stolen out of his truck a week before the murder. Yelton could not remember exactly how much money the briefcase contained, but he believed it was no less than $3,000 and no more than $5,000. In closing arguments, the State argued that the amount of money found in the car plus the other money that could be attributed to Taylor (i.e., bank deposit, money hidden under the cushion, and known spending) exceeded the amount of money in Yelton's briefcase. Hence, the State argued it was important to Taylor's defense that he deny knowing about the additional money located in the car.
[9] The four aggravating circumstances were: (1) Taylor was previously convicted of another violent felony; (2) the crime was committed while Taylor was engaged in the commission of a robbery; (3) the murder was committed for pecuniary gain; and (4) Taylor was under sentence of imprisonment at the time the murder was committed. The trial court merged the murder in the course of a felony and pecuniary gain aggravators and considered them as a single aggravator.
[10] The trial court's order reflected the following mitigation: (1) Taylor was raised in a dysfunctional family and suffered neglect and abuse during his first eleven years (proven); (2) by the time Taylor was encouraged to have an interest in education, it was too late, and he dropped out of junior high school (proven); (3) as a child and adult Taylor was known to be a thief, but not a violent person and an act of violence is out of character for him (not proven); (4) Taylor makes friends easily, enjoys people who enjoy him, and does good deeds for friends and strangers (not proven); (5) Taylor enjoys family relationships and activities (not proven); (6) Taylor has shown that he can be a skilled, reliable, and diligent worker inside and outside of prison (proven); (7) Taylor performs well when he has structure in his life (not proven); (8) Taylor has been and can continue to be a positive influence in the lives of family members (not proven).
[11] The issues raised are: (1) the trial court erred in failing to suppress evidence seized from Taylor's house and vehicle, Taylor's statements, and the clothing seized from Taylor when he was arrested; (2) the trial court erred in letting several witnesses testify about hearsay statements made by the deceased victim; (3) the trial court erred in admitting the credit application that Taylor filled out at the car dealership; (4) the trial court erred in allowing a prior consistent statement by Deputy Noble to be introduced; (5) the trial court erred in admitting the pair of boxer shorts with the victim's blood stains; (6) the marital privilege was violated when Taylor's wife was required to testify about certain communications she had with Taylor; (7) the trial court erred in instructing the jury on and finding the "under sentence of imprisonment" aggravating circumstance; (8) the trial court erred in failing to find several nonstatutory mitigating circumstances; and (9) the death sentence is disproportionate. Subsequent to the filing of briefs in this case, we allowed the parties to file supplemental briefing on whether Florida's death penalty sentencing scheme is unconstitutional in light of the United States Supreme Court's holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). This Court addressed similar contentions in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.2002), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002), and denied relief. We find that Taylor is likewise not entitled to relief on this supplemental claim.
[12] Compare Voorhees, 699 So.2d at 608 (holding that the defendant reasonably could have believed he was free to terminate the encounter with police where defendant told officers he was lost and the officers offered the defendant shelter for the night, clean clothing, and a hot meal) with Langley v. State, 735 So.2d 606, 608 (Fla. 2d DCA 1999) (stating that "it cannot be said that a reasonable person, facing six police officers and a police dog, would believe that she was free to leave").
[13] Because Taylor was wearing only a towel, the deputies suggested that he get dressed, and Strickland testified that he watched Taylor. Taylor argues that this was an overt display of authority and a substantial intrusion. However, Strickland testified that he only observed Taylor to the extent necessary to make sure Taylor did not arm himself. Although Taylor may have been uncomfortable, under the circumstances, where Taylor was the last person seen with Holzer, who was missing with a large amount of money, Strickland's actions were reasonable.
[14] Deputy Noble read Taylor his rights from a card Noble carried, and Taylor's handcuffs were removed after he was safely outside. At that point, Noble requested that Taylor sign two permission forms to allow the police to search his car and trailer. The consent forms included language indicating Taylor had been informed of his constitutional right not to have his property searched without a warrant.
[15] Noble testified at the hearing on Taylor's motion to suppress that Taylor "shrugged his shoulders like he understood." Other courts have found that shrugs and similar nonverbal gestures were sufficient to show various forms of consent. See, e.g., United States v. Stewart, 93 F.3d 189, 192 (5th Cir.1996); United States v. Wilson, 895 F.2d 168, 172 (4th Cir.1990); United States v. Griffin, 530 F.2d 739, 742 (7th Cir.1976).
[16] Because Taylor had already signed the search consents, the issue of whether Taylor was illegally under arrest at this point would only affect the admissibility of the statements he made to Detective Lester at the police station and the clothing Taylor was wearing when he was arrested.
[17] When Noble asked him to come to the station, Taylor shrugged his shoulders. Taylor's shrug was not accompanied by any form of protest or indication that he did not wish to accompany Noble to the police station, and thus could reasonably be interpreted as consent.
[18] Taylor did not claim self-defense, that Holzer committed suicide, or that the death was accidental, and therefore these exceptions are clearly inapplicable.
[19] Because the State was proceeding under the felony murder theory with kidnapping as the underlying felony, we noted:

[I]t was necessary for the state to prove that the victim had been forcibly abducted against her will, which was not admitted by the defendant. The victim's statements to her daughter just prior to her disappearance all serve to demonstrate that the declarant's state of mind at the time was not to voluntarily accompany the defendant outside of Miami or to North Carolina.
Id.
[20] In Brooks, the victim had said she was going to travel with a codefendant to go to the location where she was murdered. Id.
[21] The State also argues that the statements were appropriately introduced to rebut Taylor's opening statement claim that Holzer had only given him a ride to his trailer. However, opening statements are not evidence and therefore Holzer's statements were not used to rebut any testimony or evidence that Taylor had introduced. See Burns v. State, 609 So.2d 600, 605 (Fla.1992) (stating that comments made in opening statements do not "open the door" for rebuttal or impeachment testimony as to matters not placed at issue by evidence); Whitted v. State, 362 So.2d 668, 673 (Fla.1978) ("It is uncontroverted that the opening remarks of counsel do not constitute evidence."). Moreover, a victim-declarant's statements cannot be admitted during the State's case-in-chief to rebut evidence or testimony that has not been introduced by the defense. See, e.g., Brooks v. State, 787 So.2d at 771 (noting that state of mind of victim-declarant may become an issue when it is used to rebut a defense raised by the defendant).
[22] Taylor had included information in the boxes on the credit application listing his employer, salary, and other information, even though he was unemployed on the date that he filled out the application.
[23] The State claims that the application was relevant because it tended to prove Taylor's whereabouts on the day of the murder. However, it is unclear how the credit application, which was apparently filled out on a previous visit, could show Taylor's whereabouts on the day of the murder. Additionally, the State had introduced other evidence and testimony demonstrating Taylor's interest in the truck.
[24] As noted, Taylor's contention at trial was that McJunkin committed the robbery and murder. As part of his defense, Taylor maintained that the money that could be directly linked to him, i.e., the money he had deposited and the money under the cushion in the mobile home was from Chip Yelton's truck and that he did not know about the additional money in his rental car. In direct contradiction to this theory, Deputy Noble testified that Taylor told him there was money in the car. During cross-examination of Deputy Noble, Taylor's counsel asked a series of questions about the importance of preparing accurate and prompt written police reports. The questioning revealed that Deputy Noble's six-page missing person's report, written on December 30, 1997, did not contain a reference to Taylor's statement about the money in the car. On redirect and over Taylor's objections, the State was allowed to introduce Deputy Noble's prior testimony from the January 1999 hearing on Taylor's motion to suppress.
[25] In objecting to the introduction of Noble's statements, Taylor's defense counsel said Noble's "motive to falsify" would have been developed well before the January 1999 hearing. However, defense counsel did not claim Noble had recently fabricated his testimony.
[26] There is no indication in the record that Noble either fabricated or had the motive to fabricate his January 1999 suppression hearing testimony in order to avoid having the contents of the car suppressed. Deputy Noble testified that he knew the victim in high school, that he knew her family from having grown up and worked in the area, and that his wife had worked at Buddy Boy's. However, Noble also did not know the victim's married name. Even if we were to accept this connection with Holzer as providing Noble some type of "motive" to testify untruthfully, it would be weak in view of other cases where we have identified particular individuals' motives to falsely testify. See, e.g., Anderson v. State, 574 So.2d 87, 92 (Fla.1991) (holding witness's favorable plea agreement gave rise to motive to falsify and therefore detective should not have been able to testify as to witness's prior consistent statements made after her plea agreement); Jackson, 498 So.2d at 910 (holding that defendant's co-prisoner had a motive to falsify statements, namely to curry favor with the state regarding his imminent prosecution); Neal v. State, 792 So.2d 613, 614 (Fla. 4th DCA 2001) (same as Anderson); Quiles v. State, 523 So.2d 1261, 1263 (Fla. 2d DCA 1988) (holding that police testimony about victim's prior consistent statements improperly bolstered victim's version of events where victim had motive to falsify); Dawson v. State, 585 So.2d 443, 445 (Fla. 4th DCA 1991) (holding victim had motive to falsify before crime was even committed and therefore it was error to admit victim's prior consistent statements to police).
[27] Taylor disputed the fact that he was wearing boxer shorts at the time of his arrest. Defense counsel also introduced testimony that the brand of boxer shorts was the same type that McJunkin wore and that there were clothes strewn throughout the mobile home, apparently in an attempt to argue that even if Taylor did have the shorts on when he was arrested, when he dressed after his shower, he had accidentally put on the boxer shorts McJunkin had been wearing at the time of the crime. Deputy Strickland, who watched Taylor dress, could not recall whether or not he put on boxer shorts.
[28] The booking officer who collected Taylor's clothing testified that he stapled a note to the outside of the bag to inform the officers on duty that a Florida Department of Law Enforcement (FDLE) agent would be picking up the bag. He also testified that he stapled the bag shut and placed it in a locked cabinet under the booking desk, where it stayed for two weeks, when it was picked up by FDLE.
[29] The State argues that Taylor consented to the disclosure of a significant part of the matter or communication by placing Mrs. Taylor on the stand and eliciting testimony about her purchase of the bus ticket. However, Mrs. Taylor was not asked about her communications with Taylor during direct examination. Calling a witness who holds a testimonial privilege to the stand will not necessarily waive that privilege. Cf. Brookings v. State, 495 So.2d 135, 139 (Fla. 1986) (holding that client who testified to facts, but did not discuss substance of communication, did not waive attorney-client privilege because "[i]t is the communication with the counsel that is privileged, not the facts").
[30] The State also argues that Taylor waived the marital privilege because the conversation in question took place at the jail and therefore Taylor did not have a reasonable expectation of privacy. See, e.g., Proffitt v. State, 315 So.2d 461, 465 (Fla.1975), aff'd, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Johnson v. State, 730 So.2d 368, 370 (Fla. 5th DCA 1999). However, the cases cited by the State in support of this proposition involve situations where otherwise privileged conversations were taped or overheard by third parties. As a general rule, when third party eavesdroppers hear otherwise privileged communications, the communications are not privileged unless the communicating parties had a reasonable expectation of privacy. See § 90.507 Fla. Stat. (1999); see also Charles W. Ehrhardt, Florida Evidence § 507.2 (2001 ed.). In the instant case, however, there was no third party involved, no one overheard the conversation, and the trial court required Mrs. Taylor to directly testify as to the privileged conversation.
[31] The trial court's sentencing order does not list the reasons for rejecting the mitigating circumstances. For each rejected mitigating factor, the trial court made the statement, "This non-mitigating factor has not been proven and thus will not be considered by this Court." Moreover, for each rejected factor the court listed the evidence that would tend to support the mitigating factor, before making the cursory statement rejecting the factor.
[32] Even if the trial court had erred and should have found or assigned some weight to the mitigating circumstances in question, we would find that any error was harmless. Notably, the trial court found the most serious mitigation that Taylor presented, which involved his difficult childhood and dysfunctional upbringing. The rejected mitigation was relatively much weaker.
[33] The cases Taylor cites in arguing his sentence was disproportionate are inapposite, involving either less egregious facts or less aggravation and more mitigation. See, e.g., Larkins v. State, 739 So.2d 90, 95 (Fla. 1999) (finding two weak aggravators were outweighed by thirteen significant mitigating circumstances); Johnson v. State, 720 So.2d 232, 238 (Fla.1998) (finding death sentence was disproportionate where two aggravators existed, the prior violent felony was not strong when the facts were considered, and there was significant statutory and nonstatutory mitigation); Robertson v. State, 699 So.2d 1343, 1347 (Fla.1997) (finding death sentence was not warranted where two aggravators existed but mitigating circumstances included defendant's young age, impairment at the time of the murder, abused and deprived childhood, history of mental illness, and borderline intelligence); Terry v. State, 668 So.2d 954, 965 (Fla.1996) (finding that two aggravators did not allow for death sentence where evidence in the record supported theory that crime was a "robbery gone bad"); Wilson v. State, 493 So.2d 1019, 1023 (Fla.1986) (finding death penalty was disproportionate even without mitigation where there were two aggravating circumstances and murder was the result of a heated domestic confrontation).
[34] Taylor argues that the prior violent felony aggravator should be considered less serious because it stemmed from a 1981 offense for attempted armed robbery. In assessing the prior violent felony aggravator, it is appropriate to consider the time that has elapsed since the prior violent felony. See Larkins, 739 So.2d at 95 n. 4. In Larkins, we found a twenty year lapse between the defendant's previous violent felony and the murder compelling because "the defendant apparently led a comparatively crime-free life in the interim." Id. In the instant case, however, Taylor had been convicted of multiple crimes, albeit nonviolent crimes, and served a substantial time in jail between 1981 and the 1997 murder, so he had not led a crime-free life. The trial court's sentencing order also noted that the prior violent felony was "quite similar" to the instant case in that Taylor knew both victims and in both cases the victims were making cash bank deposits for their employer.